[No. B091857. Second Dist., Div. Four. Nov. 8, 1996.]

JOHN DOE, Plaintiff and Appellant, v.
CAPITAL CITIES et al., Defendants and Respondents.

1040

**Counsel**

Leroy S. Walker and William J. Rouse for Plaintiff and Appellant.

Carol A. Sobel, Mark D. Rosenbaum, Abby J. Liebman, Gefner & Bush, Leo Gefner, David Alter, Reich, Adell, Crost & Cvitan, Hirsch Adell and Laurence S. Zakson as Amici Curiae on behalf of Plaintiff and Appellant.

Munger, Tolles & Olson, Allen M. Katz and Terry E. Sanchez for Defendants and Respondents.

## OPINION

### VOGEL (C. S.), P. J.—

#### INTRODUCTION

An aspiring actor is first drugged and then gang-raped by a casting director and four other men one Sunday at the casting director's home. Can the actor successfully allege causes of action for sexual harassment and negligent hiring against the casting director's employers? The trial court ruled against the actor, sustaining a demurrer without leave to amend. On this appeal, we analyze the allegations in the actor's second amended complaint in light of pertinent statutory and decisional law and conclude that he has adequately pled a cause of action for sexual harassment but that the allegations for negligent hiring are insufficient as a matter of law.

#### FACTUAL BACKGROUND

*The Facts*

The operative pleading is the second amended complaint. ■ In reviewing the sufficiency of that pleading, we treat the demurrer as " 'admitting all material facts properly pleaded.' " (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Those core facts are as follows. Plaintiff[1] is an aspiring actor. Defendant Jerry Marshall (Marshall) is an associate director of casting and talent of defendant ABC Entertainment, a division of American Broadcasting Companies, Inc., which, in turn, is a subsidiary of defendant Capital Cities. The business defendants will collectively be referred to as ABC.

Plaintiff met Marshall at a movie screening at the Directors Guild in July 1993. Marshall told plaintiff he worked as a casting director at ABC and gave plaintiff his business card. Marshall told plaintiff that he " 'had a great look' " and that ABC was developing programs that could be suitable for plaintiff. Marshall invited plaintiff to an interview at his office. The next day, plaintiff went to Marshall's office at the ABC Entertainment Center in Century City and read for him. Marshall responded positively to plaintiff's audition and introduced plaintiff to Marshall's supervisor who was likewise impressed.

---

[1]Given the nature of these events, plaintiff has elected to sue as "John Doe."

In the following weeks, Marshall "spent several hours a day on most days . . . working with [plaintiff], [efforts] which . . . Marshall said[] would lead to an employment contract between . . . ABC and [plaintiff]." These efforts included auditions, a taping, meetings with other entertainment industry executives, and attempts to find an agent and a publicist for plaintiff. When instructing plaintiff to perform particular tasks, Marshall "repeatedly told [him]: 'I'm your Manager at ABC.'" On several occasions, Marshall told plaintiff that he would be introduced as a new ABC star at an annual event held at the Page Museum on September 18, 1993. Based on all of these circumstances, plaintiff "fully believed that . . . Marshall would hire him for an acting position in an ABC Entertainment production . . . ."

On Saturday, August 14, 1993, plaintiff spent the day at Marshall's office preparing for his final auditions. When they finished working, Marshall told plaintiff that "they would be meeting ABC executives for dinner that evening." "After dinner on August 14, 1993, . . . Marshall advised [plaintiff] that he 'had a brunch to go to in the morning,' and to be at . . . Marshall's home at 8:00 a.m. [the next morning]."

During the morning of Sunday, August 15, 1993, plaintiff went to Marshall's home. He did so "expecting to attend a meeting where he would meet entertainment industry executives representing ABC shows and/or for the purposes [of promoting his acting career]." Marshall gave plaintiff a glass of tea. Plaintiff drank the tea which, unknown to him, contained a drug. When plaintiff awoke, he was bound and tied. He was given multiple injections of an unknown drug and was beaten and gang-raped by Marshall and four named codefendants,[2] none of whom is alleged to have any connection with ABC. At one point when plaintiff was untied, he attempted to escape but Marshall and a codefendant forcibly took him back into the house and again injected him with a drug. Marshall ultimately drove plaintiff in plaintiff's car to Beverly Hills where he abandoned him. Plaintiff was subsequently discovered by the police.

The ordeal caused plaintiff severe emotional distress as well as a temporary memory loss for several months.

In late October 1993, Marshall and others grabbed plaintiff outside of his home and stabbed him. Plaintiff reported the stabbing to the police and to ABC. In the following six months, the "defendants" physically harassed plaintiff, threatened him by phone and by writing, and poisoned his dogs.

---

[2]Those four individuals are Barry Parker, Michael Sullivan, Ken Dickson, and Fred Goss. Plaintiff names them as defendants in his common law intentional tort causes of action. Plaintiff also alleges Doe defendants participated in the attack.

In July 1994, plaintiff filed a complaint with the California Department of Fair Employment and Housing, alleging unlawful employment practices, including sexual harassment. (Plaintiff's brief asserts that Marshall and the other four assailants are being criminally prosecuted.)

*The Causes of Action*

Based upon the above allegations, plaintiff filed a complaint alleging 10 causes of action. Against Marshall and ABC, he alleged causes of action for statutory and common law sexual harassment, retaliation for opposing sexual harassment, and failure to prevent sexual harassment and retaliation. Against Marshall, ABC, and the other named individual defendants (see fn. 2, *ante*), he alleged causes of action for assault, battery, conspiracy to commit sexual assault, false imprisonment, and intentional infliction of emotional distress. Against ABC, he alleged a cause of action for negligent hiring, training, and supervision. Lastly, against Marshall and the other named individual defendants, he alleged a cause of action for defamation based upon the claim that they falsely told others that he had consented to the sexual assault.

*The Trial Court's Ruling*

This appeal only involves the claims against ABC. After ABC successfully demurred to all causes of action alleged against it, ABC was dismissed from the case. This appeal by plaintiff, in which he is joined by four amici curiae,[3] follows.

DISCUSSION

A

We begin our discussion by noting the theory of liability this case does *not* expressly involve—vicarious liability or respondeat superior. Plaintiff's second amended complaint had alleged that ABC was vicariously liable for the common law intentional torts (assault, battery, false imprisonment, and intentional infliction of emotional distress) committed by Marshall. ABC demurred on the basis that the torts were not committed in the course and scope of Marshall's employment. The trial court agreed. During the pendency of this case, our Supreme Court clarified the law governing an employer's vicarious liability for sexual assaults. (*Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992 [47 Cal.Rptr.2d 478, 906 P.2d

---

[3]Amici curiae are the Screen Actors Guild, Inc., the American Federation of Television and Radio Artists, AFL-CIO, the American Civil Liberties Union of Southern California, and the California Women's Law Center.

440] and *Lisa M.* v. *Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291 [48 Cal.Rptr.2d 510, 907 P.2d 358].) As a result of those holdings, which will be analyzed later, plaintiff has abandoned his claims based upon vicarious liability.

Insofar as ABC is concerned,[4] the primary thrust of plaintiff's action is that Marshall sexually harassed him in violation of state law and that pursuant to that statutory scheme, ABC is liable for those actions. Before we analyze the merits of that theory, we set forth the pertinent law.

The California Fair Employment and Housing Act (Gov. Code, § 12900 et seq., hereafter the Act) states that it is an unlawful employment practice for an employer to sexually harass an employee *or an applicant.* (Gov. Code, § 12940, subd. (h).) An applicant is "any individual who otherwise indicates a specific desire to an employer . . . to be considered for employment."[5] (Cal. Code Regs., tit. 2, § 7286.5, subd. (h).) ■ The Act applies to same gender sexual harassment. (*Matthews* v. *Superior Court* (1995) 34 Cal.App.4th 598 [40 Cal.Rptr.2d 350]; *Mogilefsky* v. *Superior Court* (1993) 20 Cal.App.4th 1409 [26 Cal.Rptr.2d 116].)

■ "California case law recognizes two theories upon which sexual harassment may be alleged. The first is quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances. The second is hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment. [Citation.]" (*Mogilefsky* v. *Superior Court, supra,* 20 Cal.App.4th at p. 1414.)

In this case, plaintiff is proceeding upon the second theory. And contrary to what ABC seems to suggest, a violent sexual assault, such as that alleged by plaintiff, can be the basis of such a claim. "Harassment is defined to include physical harassment, such as an assault. (Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)(B).)" (*Capitol City Foods, Inc.* v. *Superior Court* (1992) 5 Cal.App.4th 1042, 1047 [7 Cal.Rptr.2d 418].) Indeed, it is of no legal significance that the extreme and aggravated assault alleged here is criminal because other forms of sexual assault are also criminal and subject to prosecution. In none of the civil actions for sexual discrimination of

---

[4]Plaintiff's claims against Marshall and the other individual defendants remain.

[5]Plaintiff as well as some of the amici curiae appear to believe that a "key issue" raised by this appeal is whether an applicant as opposed to an employee is subject to protection from sexual harassment. Not so. Putting aside the fact that nothing in the present record indicates that the trial court ruled against plaintiff based upon the belief that as an applicant he could not avail himself of the Act, the Act itself makes clear that an applicant is entitled to the same protection as an employee. Enough said on this point.

which we are aware has it been contended that groping and grabbing of another's body is not both a civil and a criminal assault and we cannot fathom why the two claims should be mutually exclusive. "Conduct constituting sexual harassment may violate other laws as well, such as civil laws against slander and defamation criminal and tort laws against battery and rape." (Sexual Harassment in the Workplace (Cont.Ed.Bar 1995) ch. 2, p. 4; see also Lindemann & Kadue, Sexual Harassment in Employment Law (1992) Criminal Law, ch. 16, p. 371 et seq.) The fact that the sexual harassment may also be criminal in no way undermines the potential actionable culpability of an employer.

The crux of the matter is whether under the particular facts of this case, plaintiff can allege that ABC is liable for Marshall's actions. ■ Government Code section 12940, subdivision (h)(1) provides, in pertinent part: "Harassment of an employee or applicant *by an employee other than an agent or supervisor* shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Italics added.) This section has been interpreted to mean that the employer is strictly liable for the harassing actions of its supervisors and agents (*Kelly-Zurian* v. *Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 415 & 416 [27 Cal.Rptr.2d 457]; *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608, fn. 6 [262 Cal.Rptr. 842]), but that the employer is only liable for harassment by a coworker if the employer knew or should have known of the conduct and failed to take immediate corrective action. Thus, characterizing the employment status of the harasser is very significant. This then takes us to the issue of Marshall's status vis-à-vis ABC.

■ ABC contends that because plaintiff never explicitly alleged that Marshall was a supervisor or agent, it cannot be strictly liable for Marshall's actions, assuming the other predicates of the claim are present. ABC seems to suggest that Marshall was plaintiff's coworker so that ABC can only be liable if it knew of his conduct and failed to take immediate corrective action. We disagree. Liberally and reasonably construing plaintiff's allegations—as we must do (*Dale* v. *City of Mountain View* (1976) 55 Cal.App.3d 101, 105 [127 Cal.Rptr. 520])—we find they are sufficient to plead Marshall's status as an agent.

The Act does not define "supervisor." Black's Law Dictionary (6th ed. 1990) page 1438, column 2 first defines a supervisor as "one having authority over others, to superintend and direct" and then repeats the definition in the National Labor Relations Act which parallels the definition in the California Agricultural Labor Relations Act. That statutory definition recites

that a supervisor is "any individual having authority, in the interest of the employer, to hire, . . . assign [or] reward . . . other employees . . . ." (29 U.S.C. § 152(11); Lab. Code, § 1140.4, subd. (j).) If the Act confers protection to "applicants," as it does, it is obvious that the counterpart to the position of supervisor must be the person to whom application for employment is made. Prior to employment the applicant has no "supervisor" so that logically, under the Act, the "agent" of the employer is the one designated to receive and process applications.

Plaintiff's complaint alleges that Marshall was an associate director of casting at ABC; that ABC was developing television shows that could be suitable for plaintiff; that pursuant to Marshall's request, plaintiff interviewed with him for an acting position; that Marshall introduced him to his supervisor; that Marshall told him that he was his manager; and that Marshall gave plaintiff many directions in preparation for auditions.

These allegations demonstrate that Marshall was an agent of ABC in regard to his relationship with plaintiff. "An agent is one who represents another, called the principal, in dealings with third persons." (Civ. Code, § 2295.) Witkin explains the difference between an employee (e.g., a co-worker) and an agent as follows: "It is said that a[n] *employee works* for his employer, while an *agent* also *acts for and in the place of the principal* for the purpose of bringing him into legal relations with third persons." (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 5, p. 24, italics in original.) Plaintiff's complaint effectively alleges that Marshall acted as an agent for ABC in terms of finding, grooming, and recruiting actors for ABC's shows. These allegations are therefore sufficient to establish that, vis-à-vis plaintiff's position as a potential hiree at ABC, Marshall was an agent within the terms of the Act.

However, a conclusion that plaintiff has sufficiently pled Marshall's status as an agent so as to trigger ABC's potential strict liability for Marshall's actions does not dispose of the matter. A significant issue is presented by the fact that the sexual assault occurred on a Sunday at Marshall's home.

The relationship between the location of the act of sexual harassment and the employer's liability is addressed in a regulation promulgated under the Act. It states: "In view of the common law theory of respondeat superior and its codification in California Civil Code Section 2338, an employer . . . shall be liable for the discriminatory actions of its supervisors, managers or agents committed within the scope of their employment or relationship with the covered entity . . . ." (Cal. Code Regs., tit. 2, § 7286.6, subd. (b).)

A recent Court of Appeal decision surveyed decisions from the Fair Employment and Housing Commission and reached the following conclusions. "Precedential decisions of the Fair Employment and Housing Commission have recognized that *while the harassing conduct need not occur in the workplace, it must occur in a work-related context.* '[W]hile the offending conduct may and often does occur at the place of work, it need not. Unwelcome sexual conduct perpetrated by an agent, supervisor, or co-worker, which occurs elsewhere but is in some fashion work-related also constitutes sexual harassment within the meaning of the Act.' (*DFEH* v. *Huncot Properties* (Dec. 15, 1988) FEHC Dec. No. 88-21, at p. 8.) Where a supervisor exerted and exploited his authority to compel an employee's attendance at several meals away from the office, the use and abuse of his supervisory status was sufficient to bring his sexually harassing conduct outside of the workplace within the ambit of the Act. (*DFEH* v. *Bee Hive Answering Service* (June 7, 1984) FEHC Dec. No. 84-16, at p. 19.) [¶] Further, the commission has applied common law agency principles to determine whether sexually harassing conduct was work-related. In *DFEH* v. *Hart and Starkey, Inc.* (Sept. 14, 1984) FEHC Dec. No. 84-23, the employer disavowed liability for acts of an employee while off duty but on the premises. In finding the employer liable, the commission relied on the agency analysis in *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608. . . . (*DFEH* v. *Hart and Starkey, Inc., supra*, at p. 28.) In *Rodgers* the court stated an employer was liable for risks inherent in or created by the enterprise. [Citation.] For social pursuits on the premises after work, an employer was liable if (1) it endorsed the activity by express or implied permission and (2) the activity was conceivably of some benefit to the employer or was a customary incident of the employment relationship. [Citation.]" (*Capitol City Foods, Inc.* v. *Superior Court, supra*, 5 Cal.App.4th 1042, 1048-1049, italics added.)

Citing the above decision from the Court of Appeal, our Supreme Court recently noted: "Under the FEHA, . . . there is a need to determine whether sexual conduct that occurs off the worksite or after working hours constitutes an 'unlawful employment practice' within the ambit of the act. (§ 12940.) Although rigid principles of respondeat superior would not appear to apply to FEHA claims, they do provide guidance in such determinations. [Citations.]" (*Farmers Ins. Group* v. *County of Santa Clara, supra*, 11 Cal.4th at p. 1016, fn. 14.)

From these precedents we distill the principle that while an employer's liability under the Act for an act of sexual harassment committed by a supervisor or agent is *broader* than the liability created by the common law principle of respondeat superior, respondeat superior principles are nonetheless relevant in determining liability when, as here, the sexual harassment

occurred away from the workplace and not during work hours. This then takes us to our Supreme Court's most recent decision on the relationship between respondeat superior and sexual assaults.

In *Lisa M.* v. *Henry Mayo Newhall Memorial Hospital, supra,* 12 Cal.4th 291, the plaintiff underwent an ultrasound examination at the defendant hospital. In the course of conducting the exam, the technician sexually molested the plaintiff. In the context of a summary judgment proceeding, our Supreme Court clarified the principles governing resolution of the hospital's vicarious liability for the technician's torts. While the employee's actions do not have to be motivated by an intent to serve the employer's interests, there must be a causal nexus between the tort and the employee's work. (*Id.* at p. 297.) The required nexus "that the tort be engendered by or arise from the work—is to be distinguished from 'but for' causation. [Fn. omitted.] That the employment brought tortfeasor and victim together in time and place is not enough. . . . [V]aried language [has been used] to describe the nature of the required additional link . . . : the incident leading to injury must be an 'outgrowth' of the employment [citation]; the risk of tortious injury must be ' "inherent in the working environment" ' [citation] or ' "typical of or broadly incidental to the enterprise [the employer] has undertaken." ' " (*Id.* at p. 298.) Another equally acceptable method of analysis is the concept of forseeability. "The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Id.* at p. 302.) The Supreme Court ultimately concluded that, as a matter of law based upon the evidence presented, the hospital could not be held vicariously liable for the sexual assault.

The holding of *Lisa M.* is not analytically incompatible with plaintiff's present claim. Paraphrasing the Supreme Court, "[a]n intentional tort is foreseeable, for purposes of respondeat superior, only if '*in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' [Citation.] The question is not one of statistical frequency, but a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Lisa M.* v. *Henry Mayo Newhall Memorial Hospital, supra,* 12 Cal.4th at p. 302.) Marshall, as a casting director and agent for ABC, identified, interviewed, and selected aspiring actors and actresses for roles in ABC television programs. It is not stretching to infer that a casting director will endeavor to further a promising talent with

instruction and exposure in much the same way Marshall allegedly inter-acted with the plaintiff. Independent of the input by amici curiae concerning the casting process in the entertainment industry, we are not required to view plaintiff's complaint in a vacuum. It is not implausible that a casting director, acting as a kind of gatekeeper to the glamorous world of entertain-ment, occupies a position which will predictably "create the risk [a casting director] will commit intentional torts of the type for which liability is sought" in this matter. (*Ibid.*) Viewing plaintiff's allegation liberally, that inference is fairly obvious and fairly drawn from the allegations of his pleading.

 Turning to plaintiff's allegations, we find them adequate as a matter of law to hold ABC liable for Marshall's actions. Simply stated, Marshall's alleged conduct was sufficiently work-related so as to render ABC liable. It is not significant that plaintiff never alleged that Marshall told him that the Sunday brunch was an ABC-sponsored event or even a work-related event. Plaintiff alleged that Marshall regularly spent several hours a day with him, arranged auditions and meetings with agents and publicists, and invited him to dine with him to meet with entertainment executives for the purpose of enhancing plaintiff's opportunities. Plaintiff's allegations reveal a pattern of conduct by which plaintiff was essentially at Marshall's beck and call. Indeed, it is alleged that Marshall declared he was plaintiff's "Manager at ABC."

When Marshall advised plaintiff that Marshall had a brunch engagement the next morning and to be at his home at 8 a.m., it is hardly surprising that plaintiff would accede to this request. Because the relationship was driven by Marshall's demonstrable positive interest in furthering plaintiff's career, it is not farfetched that plaintiff believed his attendance had something to do with advancing his ambition to obtain employment as an actor. After all, the request that plaintiff attend the brunch was made at a dinner that was supposedly arranged by Marshall for the purpose of having plaintiff meet ABC executives.

Additionally, it is not significant that plaintiff is not an ABC employee. The Act's expansion of protection to applicants demonstrates an intent to protect those who could be subject to sexual harassment in the course of seeking work. Presumably such conduct generally occurs in the workplace, but not necessarily. Two of the amici curiae—the Screen Actors Guild, Inc., and the American Federation of Television and Radio Artists, AFL-CIO—make the cogent point that the hiring process for actors and actresses does not conform to the limited and traditional application process common place for most job applicants. As pleaded here, casting directors not only identify

talent, but also develop and promote prospective applicants. Consequently, the circumstances germane to this case are not necessarily limited to a fixed site. Here, as plaintiff has alleged, the application process is far from static. All that is required is a showing of a legally sufficient nexus between the employment relationship and the act of harassment. That is, as long as the harassment occurs in a work-related context, the employer is liable. (*Capitol City Foods, Inc.* v. *Superior Court, supra,* 5 Cal.App.4th at p. 1045.) Plaintiff's presence at Marshall's home on August 15th was, at least for pleading purposes, a sufficient nexus to show that the assault and rape occurred in a work-related context.

Our conclusion is not inconsistent with the only published case which has addressed the issue of the employer's liability for a supervisor's sexual harassment conducted while off duty and not at the workplace.[6] In *Capitol City Foods, Inc.* v. *Superior Court, supra,* 5 Cal.App.4th 1042, the case reached the Court of Appeal via a writ petition after the trial court had denied the employer's summary judgment motion. The evidence established that the plaintiff was an employee at a Burger King where Vernon Johnson was her supervisor. On January 29, the plaintiff and a coworker asked Johnson to go out with them after work. Johnson was unable to do so that evening so he and plaintiff made plans to go out January 31. Both believed the coworker would join them. On January 31, Johnson picked plaintiff up at a grocery store. Plaintiff was wearing her Burger King uniform because, unbeknownst to Johnson, Dan Singh had changed her schedule and she was now assigned to work later that evening. Johnson telephoned Burger King and told Singh that he should not have changed plaintiff's schedule without his (Johnson's) approval "and that if [plaintiff] wanted to work she would come in late." (*Id.* at p. 1044.) Later that evening, Johnson and plaintiff had sexual intercourse. Plaintiff claimed Johnson raped her; Johnson asserted it was consensual. The next day, plaintiff quit after she told her manager what had happened. Plaintiff sued, inter alia, for sexual harassment, asserting that Johnson compelled her to accompany him on January 31 and that he thereafter raped her. Based upon this record, the trial court ruled in the employer's favor on all the causes of action except the statutory claim for sexual harassment. The employer petitioned the Court of Appeal to overturn that ruling.

The issue in the writ petition was whether the evidence established a triable issue of fact of a sufficient nexus between the supervisor's conduct

---

[6]*Kelly-Zurian* v. *Wohl Shoe Co., supra,* 22 Cal.App.4th 397, is not helpful on this point because in that case the evidence established that the supervisor physically and verbally sexually harassed the employee while at the workplace and during work hours. (*Id.* at pp. 406, 409, & 416.)

and his employment to hold the employer liable for the sexual harassment. The Court of Appeal answered the question in the negative. It wrote: "Plaintiff contends the nexus between Johnson's conduct and employment is 'overwhelming.' She argues 'but for' his position as her supervisor, the rape would not have occurred. Even assuming this speculative assertion were true, plaintiff must establish Johnson was acting within the scope of his employment or as defendant's agent. To show a sufficient nexus plaintiff points to the following: the 'date' was arranged in Johnson's office; when he picked her up she was in her Burger King uniform; and he exercised his authority to excuse her from work so she could be with him, facilitating the rape. This argument overlooks the fact that defendant conclusively refuted the allegation that Johnson forced plaintiff to accompany him or coerced her in any way prior to entering his bedroom. In light of this refutation Johnson's phone call to Burger King to excuse [the plaintiff] from work is insufficient to support an inference that Johnson was acting within the scope of his employment or as the agent of defendant." (5 Cal.App.4th at pp. 1049-1050.)

The facts in *Capitol City Foods, Inc.* v. *Superior Court, supra,* are not analogous to those alleged here. In the former matter, there was no evidence that the supervisor exercised his authority to compel the plaintiff to accompany him to the place in which the assault occurred. In fact, that case involved a non-work-related date, the impetus for which came from the plaintiff and a coworker who asked the supervisor (Johnson) to join them for a drink after closing. Because Johnson could not join the two, he and plaintiff arranged to meet on a different day, with each believing the coworker would also join them. Although the plaintiff was a trainee under Johnson's supervision, her place of employment was a fast-food restaurant and there was nothing about her date with Johnson to suggest that it took place in a work-related context. In short, *Capitol City Foods, Inc., supra,* does not involve anything like the pattern of conduct alleged here where the applicant's admission to employment requires continuous participation in a variety of activities at various locations in pursuit of his acting career.

We therefore conclude that plaintiff's allegations in the first cause of action, pled pursuant to Government Code section 12940, subdivision (h), are adequate to establish a statutory claim for sexual harassment. It therefore follows that his fifth cause of action, labeled "Sexual Harassment in Violation of Public Policy," is legally sufficient because one of the alleged sources of public policy is Government Code section 12940.[7]

In summary, plaintiff is an "applicant," casting director Marshall is an "agent" of ABC, and Marshall's conduct did subject plaintiff to sexual

[7]The other alleged source of public policy is article I, section 8 of the California Constitution. The constitutional provision provides: "A person may not be disqualified from

harassment in a work-related context pursuant to Government Code section 12940, subdivision (h). Our reading of the Act strictly imposes liability on ABC without regard to what ABC knew or should have known about Marshall's propensities if plaintiff can prove what he has alleged in his first and fifth causes of action. Plaintiff's other causes of action are inadequate as a matter of law for the reasons stated in the remainder of this opinion.

## B

The second cause of action is labeled "Retaliation for Opposition to Sexual Harassment in Violation of" Government Code section 12940, subdivision (f). That section provides that it is an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Essentially, plaintiff urges that ABC engaged in retaliation because, after learning of plaintiff's complaint, it took no steps to restrain Marshall and permitted Marshall to physically harass and threaten plaintiff. The allegation suffers from several deficiencies. To a large extent, this is simply a disguised effort to foist vicarious liability onto ABC for the intentional torts committed by Marshall and others after the sexual assault, an effort which must fail given plaintiff's express abandonment of that theory. The theory also appears to be an effort to urge a common law negligence theory of failure to control the acts of an employee. If so, it must fail for lacking the necessary allegations, a point we will develop later in evaluating plaintiff's theory of negligent hiring and supervision of Marshall. And to the extent the theory can be construed as an effort to allege statutory liability it fails because the alleged acts of retaliation—the physical assaults and threats by Marshall and others—occurred *before* plaintiff filed his sexual harassment complaint in June 1994 with the Department of Fair Employment and Housing. Although the second amended complaint does allege that plaintiff spoke with the police and ABC in October 1993, it merely alleges that the purpose of those communications was to inform them of the stabbing incident which had just occurred. Plaintiff never alleged the date, if any, he informed ABC of the sexual assault. It therefore follows that the sixth cause of action, labeled "Retaliation in Violation of Public Policy," must also fail.

The third cause of action is labeled "Failure to Prevent Sexual Harassment and Retaliation" in violation of Government Code section 12940, subdivision (i). That section makes it unlawful for "an employer . . . to fail to take

entering or pursuing a business, profession, vocation, or employment because of sex . . . ." We need not and do not decide if this constitutional provision is sufficient by itself to create, based upon the allegations in the second amended complaint, a cause of action against ABC for Marshall's actions.

all reasonable steps necessary to prevent discrimination and harassment from occurring." The allegations are insufficient because, as we shall now explain, plaintiff has failed to allege sufficient facts to show ABC's prior knowledge of Marshall's propensity to engage in this particular form of sexual harassment.

The eighth cause of action is labeled "Negligent Hiring, Training and/or Supervision." In essence, plaintiff asserts that ABC's negligence in either hiring or supervising Marshall resulted in the sexual assault and on that basis ABC can be held liable. California case law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee. (*Evan F.* v. *Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 836 [10 Cal.Rptr.2d 748].) Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes. (*Id.* at pp. 836-837.) This is where plaintiff's complaint flounders.

Plaintiff alleged that ABC knew or should have known that "Marshall engaged in the purchase and use of serious, mind-altering illegal drugs, that defendant Marshall used his position at ABC to gain sexual favors, and that use of a 'casting couch' is common within the entertainment industry."[8] Given the harm that plaintiff suffered—a brutal sexual assault after having been surreptitiously drugged—the pleading allegations are insufficient to allege a cause of action. ABC's knowledge that Marshall personally used "serious mind-altering drugs" does not equate with knowledge that he would surreptitiously use drugs to place a prospective employee into a situation of helplessness before violently assaulting him. Nor does ABC's knowledge that Marshall used his position "to gain sexual favors" have material relevance to this matter. Use of the word "gain" is consistent with the quid pro quo form of sexual harassment[9] but that is not the basis of plaintiff's claim. The "casting couch" allegation suffers from a similar infirmity. That is, knowledge that Marshall used his position of authority to extract or to coerce

---

[8] The introductory portion of the complaint alleged that ABC "had sufficient knowledge about defendant Jerry Marshall's background and nature that [it]could reasonably foresee that defendant Marshall in his capacity as a casting director for ABC Entertainment could harm plaintiff as discussed, *infra.*"

[9] This analysis is borne out by the following allegations in the introductory portion of the complaint: "[P]laintiff further alleges that defendant Marshall repeatedly used his position at ABC for the purpose of obtaining sexual relations with persons in return for assistance to the persons in advancing in the entertainment industry, including at ABC, a practice commonly referred to as a 'casting couch.' Plaintiff further alleges that defendant ABC knew or should have known that (a) use of a casting couch is common among casting personnel in the entertainment industry, and (b) defendant Marshall was using his office and responsibility for this purpose."

sexual favors is not knowledge that he would first drug and then attack a potential employee. In the context of negligent hiring, those are qualitatively different situations. In sum, the cornerstone of a negligent hiring theory is the risk that the employee will act in a certain way and the employee does act in that way. Plaintiff has failed to allege those necessary facts.

## DISPOSITION

The judgment is reversed to the extent that the trial court sustained without leave to amend the demurrer to the first and fifth causes of action alleged against respondents in the second amended complaint and dismissed those causes of action. In all other respects, the judgment is affirmed. Appellant to recover his costs on appeal.

Baron, J., and Aranda, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied February 26, 1997.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.