**Barbara A. SARRO, Plaintiff,**

v.

**CITY OF SACRAMENTO, Defendant.**

**No. CIV.S-98-1498 FCD/PAN.**

United States District Court,
E.D. California.

Dec. 22, 1999.

---

**11.** Preliminary Hearing Transcript 41:11–14.

Leo F. Donahue, Leo F. Donahue, Inc., Gold River, CA, for plaintiff.

Adrian L. Randolph, Thomas A. Cregger, Barry & Randolph, Sacramento, CA, for defendant.

## MEMORANDUM AND ORDER

DAMRELL, District Judge.

Plaintiff Barbara A. Sarro initially brought this action alleging sexual harassment, discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), the California Fair Employment and Housing Act, Cal. Gov. Code § 12920 *et seq.* ("FEHA") and 42 U.S.C. § 1983. Defendant City of Sacramento ("City") moved for summary judgment. The City's motion was initially heard on August 6, 1999. By memorandum and order filed August 9, 1999, the court granted the City's motion as to Sarro's § 1983 cause of action and continued the motion as to Sarro's sexual harassment cause of action to allow Sarro additional time to obtain evidence as to whether the City took "adequate remedial measures" as required under *Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1482 (9th Cir.1997). During oral argument on August 6, 1999, Sarro, through her counsel, represented to the court that she had not brought a claim for retaliation. The court's memorandum and order filed August 9, 1999 noted the representation, and accordingly, did not address retaliation. Because the court finds that Sarro is estopped from asserting a retaliation claim in this action and because Sarro failed to introduce evidence of an adverse

employment action, the City's motion is granted as to Sarro's retaliation and discrimination claims. Because the court finds that a reasonable factfinder could find that the City failed to take "adequate remedial measures," the City's motion is denied as to Sarro's sexual harassment claim.

## BACKGROUND[1]

At all relevant times herein, plaintiff Barbara Ann Sarro was employed by the City's Purchasing Office. She worked at what is known as the Corporate Yard. Employees from other City departments and agencies, including the City's police department, also work at the Yard. One such employee was Michael Cooper, a peace officer with the City's police department. Cooper's office was located upstairs from Sarro's work area.

On the afternoon of August 19, 1999, Cooper phoned Sarro at work and suggested they meet somewhere after work so that he could give her a hug. Sarro declined the invitation. On August 20, 1997, Sarro contends the following occurred: Cooper asked her to come to his office and assist him in locating a printer port on his computer. When Sarro leaned over the computer to look behind it for the port, Cooper leaned over her from behind and reached his right hand down the front of her blouse and underneath her bra and physically squeezed her breast. At the same time, he placed his left hand under her skirt and groped her left thigh. Sarro immediately removed Cooper's hands from her body. Cooper then grabbed Sarro's hand and placed it on his groin where she could feel his erect penis. Sarro pulled her hand from his grasp. Cooper then began to kiss Sarro. Sarro again pulled away from Cooper, verbally protested his actions and left the room.

Sarro immediately reported the incident to her supervisor Bob Holbrook, who immediately contacted Kenneth Fleming, the City's Affirmative Action Officer. That same day, Fleming interviewed Sarro, her co-worker Chris Slay and her supervisor Barbara Dennis.

Following Sarro's complaint, Cooper was immediately removed from the office where Sarro worked, assigned to work at another location, and directed not to contact or attempt to contact Sarro or be present at her workplace. Cooper was informed of these restrictions by letter. The letter also warned Cooper that further similar conduct would result in discipline, including the possibility of termination. The letter was placed in Cooper's personnel file. *See* Ex. A to Braziel Decl. Cooper did not have or attempt to have any further contact with Sarro.

In addition to reporting the incident to her manager, Sarro also made a criminal complaint and reported the incident to the police department's internal affairs division. Thereafter, investigations were conducted by both the police department and its internal affairs division. After internal affairs began its investigation, Fleming, the City's Affirmative Action Officer, discontinued his investigation. Indeed, on the date the incident occurred, Fleming informed Sarro that if she filed a complaint with the police department or internal affairs, his investigation would cease. The results of the criminal investigation were eventually turned over to the district attorney's office which declined to prosecute the action.

Internal affairs interviewed 26 witnesses in the course of its investigation. Of those 26 witnesses, only five (Lori La-Grassa, Cooper's partner, Barbara Dennis, Sarro's supervisor, Chris Slay, Sarro's co-worker, Bob Holbrook, Sarro's manager, and Ken Fleming, the City's Affirmative Action Officer) were interviewed concerning the events in question. The remainder

---

1. The following facts are undisputed or as represented by Sarro. *See Reynolds v. County of San Diego,* 84 F.3d 1162, 1166 (9th Cir. 1996), *rev'd on other grounds, Acri v. Varian Assocs., Inc.,* 114 F.3d 999 (9th Cir.1997)

(when considering a motion for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party).

of the investigation focused on Sarro's background. In addition to interviewing 21 additional witnesses, internal affairs ran Sarro's fingerprints and investigated her purchase of her automobile and the veracity of her employment application with the City.

In his investigation summary, Sergeant Robby Lake concluded:

> Due to the fact that there is no physical evidence and a telephone conversation between Sarro and Cooper ... was inconclusive it is impossible to prove the allegation of sexual battery. Officer Cooper, in his statement, admits to hugging Sarro but denies any touching of her breasts and thigh. While Officer Cooper's admitted behavior may be a conduct issue it falls far short of sexual battery as alleged by Sarro.

> Based on the statements of Barbara Sarro that she had been involved in a similar allegation in San Jose in 1992 a thorough investigation was conducted by Internal Affairs. This investigation reveals that Barbara Sarro represents herself with deception as they [sic] relate to her true statements and intentions.

Internal Affairs Investigation File, Bates 203-04.

On or about June 8, 1998, Cooper was informed that he would be suspended for 20 hours based on the following:

> 1.  On August 19, 1997, while on-duty you contacted [Sarro] by telephone and attempted to arrange a personal meeting with her after work.
> 2.  On August 20, 1997, while on-duty ... you made an unwelcome and inappropriate advance toward [Sarro] ....
> 3.  During your Internal Affairs interview you admitted calling and "hugging" [Sarro] while on-duty.

*See* Ex. J to Cregger Decl.

Cooper appealed, and the matter was ultimately settled. *See* Exs. K and L to Cregger Decl. The 20 hour suspension remained intact, and any reference thereto will be removed from Cooper's personnel file after a period of five years from the date the discipline was imposed provided the department does not impose additional formal discipline during the five year period. *See* Ex. L to Cregger Decl. In addition to the suspension, Cooper was removed from his appointed position as a problem oriented policing officer and returned to patrol where the City contends he is subject to greater supervision. Braziel Decl. ¶ 4.

## STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his or her burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor

of either party." *Id.* at 250, 106 S.Ct. 2505. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991); *T.W. Elec. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir. 1985); *Thornhill Publ'g Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

## ANALYSIS

### 1. Retaliation and Discrimination

■ Sarro contends that she was discriminated and retaliated against as a result of her sexual harassment complaint. To establish a prima facie case of retaliation or sex discrimination under either Title VII or FEHA, Sarro must prove that she suffered an adverse employment action. *See Payne v. Norwest Corp.,* 113 F.3d 1079, 1080 (9th Cir.1997) (retaliation under Title VII); *Flait v. North Am. Watch Corp.,* 4 Cal.Rptr.2d 522, 3 Cal. App. 4th 467, 476 (1992) (retaliation under FEHA); *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1219, 1220 (9th Cir.1998) (discrimination under Title VII and FEHA). Sarro has provided no evidence that would support a finding that she suffered an adverse employment action. Indeed, she contends she need not do so insofar as the discrimination and retaliation constitute harassment. To the extent Sarro is alleging a claim for sexual harassment, that claim is discussed below. To the extent she is alleging retaliation or another form of disparate treatment based upon her sex, summary judgment is appropriate as she has failed to introduce evidence of an adverse employment action.

■ The court also finds that Sarro is estopped from asserting a retaliation claim in this action, having represented in open court through her counsel that she was not suing on retaliation. *See Matek v. Murat,* 638 F. Supp. 775, 782-83 (C.D. Cal. 1986); *see also Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 214 (1st Cir. 1987) ("On reflection, representations ... that a party will abandon a claim, present a stronger argument than do the classic cases for application of the doctrine [of judicial estoppel].")[2] Accordingly, the City's motion for summary judgment is granted as to Sarro's retaliation and discrimination claims.

### 2. Sexual Harassment

■ The City contends that it cannot be held liable for Cooper's alleged harassment because, upon learning of the alleged harassment, it took appropriate remedial measures.

· ■ "Once an employer becomes aware of co-worker sexual harassment, the employer must take adequate remedial measures in order to avoid liability for the

**2.** During oral argument on August 6, 1999, the court asked Sarro's counsel about what appeared to the court to be allegations of retaliation contained in her complaint. The following colloquy ensued:

The Court: Now retaliation. Let's talk about retaliation. The City contends that your client failed to exhaust her administrative remedies on the retaliation claims, and as I understand it, the retaliation claims are all after the fact. There was never any retaliation claim ever made. Are there any EEOC or DFEH complaints on retaliation?

Mr. Lacy: Your Honor, we did not sue on retaliation.

The Court: You did not.

Mr. Lacy: We did not.

The Court: Well, maybe I'm looking at a different complaint.

Mr. Lacy: Count 1 and 2, discrimination slash harassment, state and federal.

The Court: You are not suing for retaliation.

Mr. Lacy: Not at this time.

The Court: All right.

harassment." *Yamaguchi*, 109 F.3d at 1482; *see also Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1046, 58 Cal.Rptr.2d 122 (1996) (same rule applicable under FEHA). "These measures must include immediate corrective action reasonably calculated to 1) end the current harassment, and 2) to deter future harassment from the same offender or others." *Yamaguchi*, 109 F.3d at 1483. "[T]o avoid liability an employer must take at least some form of disciplinary action against a harassing co-worker in order to prevent future workplace sexual harassment." *Id.* The plaintiff must "show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can ... be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment." *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir.1998) (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)).

## A. Current Harassment

After Sarro complained of sexual harassment, Cooper was immediately removed from the office where Sarro worked, assigned to work at another location, and directed not to contact or attempt to contact Sarro or be present at her workplace. Cooper was also informed that any further similar conduct would result in discipline, including the possibility of termination. Finally, a letter informing Cooper of the above was placed in his personnel file. These actions were intended to end the current harassment, and to this end, were presumably adequate. *See Yamaguchi*, 109 F.3d at 1482. Indeed, Cooper had no further contact with Sarro.

## B. Future Harassment

In addition to ending the current harassment, an employer's actions must also be reasonably calculated to deter future harassment from the same offender or others. *See id.* at 1483. Sarro contends that the City failed to take adequate remedial measures by inadequately investigating her claim, improperly focusing the investigation on her and her background and failing to impose discipline proportionate to the Cooper's conduct.

### (1) The Investigation

Following Sarro's complaint, three separate investigations were undertaken. Initially, Fleming, the City's Affirmative Action Officer, undertook an investigation of Sarro's claim. Fleming, however, abandoned his investigation once internal affairs began its investigation.

According to the City's Policy on Discrimination and Harassment, "[t]he Affirmative Action Officer (or Director of Human Resources designee) will investigate and attempt resolution of discrimination or harassment complaints in accordance with the City's *Internal Discrimination Complaint Resolution Guide ....*" *See* Ex. A to Donahue Decl. The *Internal Discrimination Complaint Resolution Guide* provides that, "[t]he Affirmative Action Officer will interview witnesses and/or review documents to determine whether there is enough evidence to show unlawful discrimination." This was not done.

As set forth above, Fleming abandoned his investigation once internal affairs began its investigation. Even assuming Fleming could delegate his duty to investigate to internal affairs, the internal affairs officers who investigated Sarro's complaint had no training in sexual harassment claims. Nor did they consider the investigation as a sexual harassment investigation. As Lieutenant David Paroli explained to Sarro, "Because we are investigating conduct, we're not doing a, the sexual harassment or that type of an investigation Barbara. We're investigating the conduct of our employee to which you're a witness." It is clear from Sergeant Lake's investigation summary that internal affairs viewed its investigation as a sexual battery/improper conduct investigation. Contrary to the City's Policy on Discrimination and Harassment, no determination was ever made as to "whether there [was]

enough evidence to show unlawful discrimination."

Internal affairs interviewed 26 witnesses in the course of its investigation. Only five witnesses were interviewed concerning the events in question. The remaining 21 individuals were interviewed concerning Sarro's background. Incredibly, twelve individuals were interviewed concerning a 1992 criminal case filed against a San Jose dentist. Sarro, a patient of the dentist, was a victim of a sexual assault and a complaining witness. *Sarro was one of eight victims in the case.* The dentist was convicted by a jury of six counts of sexual assault, two counts of false imprisonment and one count of prostitution. Internal affairs interviewed the convicted criminal defendant, his three attorneys, two other victims, four witnesses and two detectives in that case.[3] Internal affairs also interviewed Sarro's ex-husband about their marriage, including how they met and "problems" with their marriage. Internal Affairs Investigation File, Bates No. 629. Perhaps most remarkably, internal affairs hunted down and interviewed a finance manager at a San Jose automobile dealership with whom the convicted criminal defendant alleged Sarro had an affair. The individual stated that he did not know Sarro and denied any such relationship. *Id.,* Bates No. 490. The record further discloses that on September 29, 1997, Lieutenant Paroli, Sergeant Lake and two other Sacramento police officers traveled to San Jose "to conduct interviews with persons that *knew or were in any way involved with* [Sarro]." *Id.,* Bates No. 484 (emphasis added). In addition to pursuing witnesses, internal affairs ran Sarro's fingerprints and investigated her application for employment with the City and purchase of her automobile. *Id.,* Bates Nos. 271, 477, 917, 891-95.

Internal affairs also interviewed Cooper and Sarro. Cooper denied touching Sarro in the manner she described. He did, however, admit that on August 19, 1997, he suggested to Sarro that they meet after work so that he could give her a hug. Cooper further admitted to "hugging" Sarro twice on August 20, 1997, the day Sarro alleges he assaulted her. *Id.,* Bates Nos. 153, 155, 167. In addition to questioning Sarro about the events in question, investigators asked her about her attire at the time of the incident, including whether she was wearing any underwear, a bra or pantyhose. *Id.,* Bates Nos. 28-29. Investigators asked her about her romantic relationships, including an alleged relationship with a detective with the San Jose Police Department who conducted the criminal investigation of the dentist. *Id.,* Bates Nos. 73-74. When she denied the relationship, Sarro was asked, "what would you say if I told you that I have a witness that saw you and [the detective] in an embrace and full mouth kiss outside of your residence." *Id.,* Bates No. 73. They interviewed her about her former marriage, including whether her former husband was "mentally slow" or "physically abusive." *Id.,* Bates Nos. 84-85. They also asked her whether she had done any modeling work, and whether she "ever danced on a table top or a platform fully clothed or partially clothed or unclothed" or "danced while she was intoxicated for people or for money." *Id.,* Bates Nos. 280, 530.

The scope of the investigation conducted by internal affairs was, in the City's own words, "problematic." At best, it can be described as an attempt to discredit Sarro and at worst an effort designed to humiliate and embarrass her. As set forth above, the investigation was not directed at determining "whether there is enough evidence to show unlawful discrimination" as required under the City's Policy on Discrimination and Harassment. Nor was it reasonably tailored to accomplish its stated purpose -- determining whether a sexual

---

**3.** Internal affairs cites Sarro's involvement in this case as justification for its "comprehensive" investigation into Sarro's background. Indeed, Sarro's involvement in this case appears to have raised doubts in the minds of the investigating officers as to Sarro's credibility. Given the dentist's conviction on nine criminal charges involving eight victims, Sarro's involvement would logically strengthen her credibility, not call it into question.

battery was committed and whether Cooper engaged in improper conduct. While the City acknowledged during oral argument that portions of the investigation were "problematic," the City contends that so long as Sarro's sexual harassment claim was "thoroughly investigated," the remainder of the investigation is irrelevant. The court disagrees.

First, as set forth above, the City failed to follow its own policy concerning sexual harassment investigations. Moreover, given the seriousness of Sarro's complaint, a reasonable factfinder could find that the investigation that was conducted was not thorough. No witnesses were interviewed concerning Cooper's credibility, an issue that was clearly relevant given the conflicting versions of what took place.[4] Moreover, none of Cooper's former female partners or female co-workers were interviewed. *See Mockler*, 140 F.3d at 813 ("The failure to interview witnesses is evidence of inadequate remedial action.") A reasonable factfinder could conclude that the City's failure to follow its own policy concerning such investigations or interview witnesses to test Cooper's credibility and/or investigate his background is at least evidence of an inadequate investigation.

Second, even if the court were to accept the City's assertion that Sarro's complaint was thoroughly investigated, the court does not accept its assertion that the remainder of the investigation is irrelevant. The court must determine whether the City's actions were reasonably calculated to deter future harassment by the harasser or others. *Yamaguchi*, 109 F.3d at 1483. As discussed below, internal affairs' relentless probe into Sarro's past is absolutely relevant to such a determination.

Viewing the evidence in the light most favorable to Sarro, a reasonable factfinder could conclude that the manner in which the investigation was conducted would deter *reporting* of harassment, and thus, was not reasonably calculated to deter future harassment. Much of the investigation into Sarro's background focused on the most personal and private aspects of her life, including her former marriage, her current relationship and her sexual history. Sarro was clearly aware of and offended by the extent of the investigation. On October 8, 1997, after learning that one of her former co-workers stated that Sarro used to be an escort (something Sarro denies and Sergeant Lake admits was never confirmed), Sarro stated to Sergeant Lake, "I don't know whether somebody's trying to get dirt on me for one.... I thought I was doing the right thing by coming forth and now all of a sudden everybody's doing an investigation on me." Internal Affairs Investigation File, Bates No. 242. Similarly, on December 10, 1997, Sarro stated to Lieutenant Paroli:

> [Y]ou guys are doing an investigation on me.... Oh I'm a victim.... The investigation that's being done is on me, there's nothing being said about what he said about what he did. Everything, I mean everything has been like basically put aside, everything has to do with my past and questions on me. I've already had phone calls from everybody telling me the things that have been brought up or that, that the Internal Affairs has told them and asked them if they know about and it was like why, how, I mean anything about my past for one, I have no problem with like I said. But is it relevant to what was done or what happened here. And the whole purpose of this meeting from what I thought and the whole purpose of you guys doing an investigation is to find out whether or not something has happened, whether you guys are really going to, whether

---

**4.** In his investigation summary, Sergeant Lake states that Sarro "represents herself with deception as they [sic] relate to her true statements and intentions." Internal Affairs Investigation File, Bates No. 202. As discussed below, the court is not required to accept conclusory declaration testimony that internal affairs' assessment of Sarro's credibility was not considered in determining the discipline ultimately imposed. In any event, internal affairs' assessment is relevant to the extent it impacted the scope and direction of its investigation.

you're actually going to take any action towards this, this person but I don't understand why the questions and the whole purpose of this meeting is actually for you guys to clarify questions or things about my past.

*Id.,* Bates No. 254.

■ "Harassment is to be remedied through actions targeted at the harasser, not at the victim." *Intlekofer v. Turnage,* 973 F.2d 773, 780 n.9 (9th Cir.1992) (citing *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir.1991)). The victim of sexual harassment should not be punished for the conduct of the harasser. *See Intlekofer,* 973 F.2d at 780 n.9. Here, the City's investigation of Sarro's complaint focused on Sarro not Cooper. While the City was allegedly attempting to investigate Sarro's claim, it did so at the expense of delving into Sarro's past, forcing her to relive painful memories, reveal details of her private life and dispute humiliating accusations which were wholly unrelated to her claim. "This is not the price that victims must pay for reporting sexual harassment at the workplace." *See id.*

(2) *The Discipline*

"To avoid liability an employer must take at least some form of disciplinary action against a harassing co-worker." *Yamaguchi,* 109 F.3d at 1483. "The adequacy of the employer's response depends on the seriousness of the sexual harassment." *Id.*

Following its investigation, the City concluded that: (1) on August 19, 1997, while on-duty, Cooper contacted Sarro by telephone and attempted to arrange a personal meeting with her after work; (2) on August 20, 1997, while on-duty, Cooper "made an unwelcome and inappropriate advance toward [Sarro];" and (3) during his internal affairs interview Cooper admitted to calling and "hugging" Sarro

while on-duty. As a result, Cooper was suspended for twenty hours without pay.[5]

Officer Edward J. Takach, a Labor Relations III Officer, reviewed whether the intended discipline was proportional to Cooper's actions and consistent with the City's policies and practices with respect to the imposition of discipline. *See* Takach Decl. ¶¶ 2, 3. Takach determined that the 20 hour suspension was proportionate to Cooper's actions and consistent with the City's policies and practices based on the following: (1) the only witnesses to the event were Sarro and Cooper, and their accounts of what occurred were at odds with one another, and (2) his belief that it was the maximum amount of discipline which could be upheld on appeal under the rules and regulations of the Civil Service Board. *Id.* ¶ 4. According to Takach, if Cooper appealed the decision, the City would have to prove by a preponderance of the evidence that the action taken was justified. *Id.* Because the evidence consisted of differing accounts of the events, Takach believed that the 20 hour suspension was the maximum amount of discipline which would be upheld on appeal. *Id.* Takach also noted that the suspension was not the minimal disciplinary action available. Rather, a letter of reprimand could have been issued and would have remained in Cooper's file for only two-years, while the record of his suspension will remain in his file for five years. *Id.* ¶ 5.

As discussed above, a reasonable factfinder could conclude that the City's actions were not reasonably calculated to deter future harassment. First, the City's conclusions as to what occurred may have been flawed by the manner of the investigation. Second, there was no evidence presented that a 20 hour suspension was proportionate to Cooper's misconduct. While the City contends that 20 hours was the most se-

**5.** Article 21.1 of the Collective Bargaining Agreement between the Sacramento Police Officers Association and the City provides that an officer suspended without pay may forfeit accumulated holiday and/or vacation credits equal to the number of hours of suspension in-lieu of such suspension. Accordingly, the fact that Cooper was permitted to use his accumulated vacation time to cover his suspension is not evidence that the discipline imposed was inadequate.

vere penalty it could impose, it has provided no evidence to support its assertion other than conclusory declaration testimony which is legally insufficient. The City failed to introduce any evidence of what type of discipline has been imposed by the City in the past for similar conduct. Nor did it cite to one instance where more severe discipline for similar conduct was not upheld on appeal. *See Mockler*, 140 F.3d at 813 n.4 (finding such evidence relevant to determination of whether discipline imposed is proportionate to offense).

Viewing the evidence in the light most favorable to Sarro, a reasonable factfinder could conclude that Cooper's 20 hour suspension was not proportionate to the seriousness of his conduct. *See id.* at 814 (finding one day suspension failed to deter harasser and other potential harassers).[6]

### CONCLUSION

Looking at the actions taken by the City as a whole, including the manner in which the investigation was conducted, its potential effect on the City's findings in this case and future victims of harassment and the lack of evidence as to whether the discipline imposed was proportionate to the conduct, and viewing the evidence in the light most favorable to Sarro, a reasonable jury could find that the actions taken were not reasonably calculated to deter future harassment by Cooper or others.

Accordingly, the City's motion for summary judgment is DENIED as to Sarro's sexual harassment cause of action and GRANTED as to Sarro's discrimination and retaliation causes of action.

IT IS SO ORDERED.

---

**6.** The City contends that his removal from his appointed position as a problem oriented policing officer and return to patrol constituted additional discipline. These assertions are contrary to the statements contained in a memo from Matt Powers, Deputy Chief of Operations, to Arturo Venegas, Jr., Chief of Police. The subject of the memo was Cooper's Skelly hearing. In the memo Powers rejects Cooper's assertion during the hearing that the transfer constituted discipline or was otherwise punitive in nature. Internal Affairs Investigation File, Bates No. 197.