Filed 2/24/23; Certified for Publication 3/14/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HANIN ATALLA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RITE AID CORPORATION et al., <br><br> Defendant and Respondent. | F082794 <br><br> (Super. Ct. No. 19CECG00569) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Ken Fitzgerald and C. Athena Roussos, for Plaintiff and Appellant.

Klein, Hockel, Iezza & Patel, Thomas K. Hockel, Jonathan A. Klein, Mark P. Iezza, for Defendant and Respondent.

-ooOoo-

Plaintiff Hanin Atalla filed a sexual harassment, failure to prevent sexual harassment, wrongful constructive termination, discrimination, and retaliation action against her former employer, Rite Aid Corporation and Thrifty Payless, Inc., dba Rite Aid. Atalla's lawsuit stemmed from an offsite and afterhours text exchange she had with a Rite Aid district manager, Erik Lund, in which the latter sent lewd photographs to her. Atalla and Lund knew each other, and were friends, from a time before Atalla started working at Rite Aid. The Rite Aid defendants brought a summary judgment motion. The trial court granted summary judgment in favor of the Rite Aid defendants as to all of Atalla's claims. Atalla appealed. We affirm.

## PROCEDURAL HISTORY

Atalla filed the present action against defendants Rite Aid Corporation, Thrifty Payless, Inc., dba Rite Aid, and Erik Lund, in the Fresno County Superior Court.[1] Atalla's first amended complaint (complaint) asserted the following causes of action: (1) sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (j));[2] (2) failure to prevent sexual harassment under FEHA (§ 12940, subd. (k)); (3) constructive termination in violation of public policy; (4) sexual harassment (hostile work environment) under FEHA (section 12940, subd. (j)); (5) discrimination under FEHA (§ 12940, subd. (a)); (6) retaliation under FEHA (§ 12940, subd. (h)); (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress. Atalla's complaint also included a claim for punitive damages. Rite Aid Corporation and Thrifty Payless, Inc., dba Rite Aid (collectively Rite Aid) filed answers to the complaint.

Rite Aid thereafter filed a motion for summary judgment, which Atalla opposed. The supporting papers to Atalla's opposition included a declaration from her as well as a

---

[1] This appeal involves only the Rite Aid defendants.

[2] Subsequent statutory references are to the Government Code unless otherwise specified.

2.

declaration from one of her attorneys; Atalla also recorded objections to various facts included in Rite Aid's separate statement of undisputed facts in support of its motion for summary judgment. Rite Aid filed a reply, which included Rite Aid's objections to parts of Atalla's declaration, among other evidentiary objections.

Almost three months later, Atalla filed a "Supplemental Separate Statement of Additional Material Undisputed Facts," along with a supporting declaration. (Unnecessary capitalization omitted.) Rite Aid filed a reply, in which it objected to the "Supplemental Separate Statement."

Shortly thereafter, the trial court heard oral argument on Rite Aid's summary judgment motion. That same day, the court issued a minute order adopting, as its final ruling, its previously issued, tentative ruling. The court ruled it would not consider the "untimely" supplemental opposition papers filed by Atalla. The court also declined to rule on Atalla's objections to certain facts included in Rite Aid's separate statement of undisputed facts. In addition, the court did not rule on Rite Aid's objections to evidence adduced by Atalla in support of her opposition.[3]

The court granted Rite Aid's motion for summary judgment. As to Atalla's claims of workplace sexual harassment (the first and fourth causes of action in the complaint), the court observed: "The question is whether the harassment arose from a completely private relationship unconnected with the employment. I think defendants have met their burden of showing that this is the case." The court granted Rite Aid's motion as to these claims. With regard to Atalla's claim for constructive termination (the third cause of action in the complaint), the court ruled: "The undisputed facts show that plaintiff quit – she was not constructively terminated. The motion should be granted as to the third

---

**3**      When the trial court does not rule on objections, it is presumed the objections were overruled and the trial court considered the relevant evidence in its ruling. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) On appeal, the reviewing court also considers that evidence. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035.)

3.

cause of action." The court also granted the motion as to the remaining causes of action.[4] This appeal followed.

<strong><u>FACTUAL BACKGROUND</u></strong>

On review of summary judgment, we view the facts in the light most favorable to plaintiff as the losing party below. (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 884, fn. 5.)

**A.      Atalla and Lund Developed a Friendship Before Atalla Began Working at Rite Aid; the Friendship Continued While Atalla Was Employed at Rite Aid**

Lund was a district manager or district leader for Rite Aid. Within Rite Aid's Region 13, Lund oversaw one district; his district encompassed "the greater Fresno area." The district included part of the city of Fresno and areas to the north, including Los Banos, Newman, Mariposa, and Oakhurst. Lund oversaw the operations of "14 to 16" Rite Aid stores in his district.

Atalla and Lund met in the "early fall" of 2017, during her last year of pharmacy school, when she did a six-week "business administrative rotation with Rite Aid." The rotation entailed Atalla "shadow[ing]" Lund. Lund was Atalla's "preceptor" for the rotation. Atalla did six other rotations besides the Rite Aid rotation as part of her pharmacy school requirements. When Atalla's rotation with Rite Aid ended, Atalla celebrated at a dinner with Lund and his wife. Atalla stayed in close touch with Lund thereafter.

From May 2017 to February 2018, while she was in pharmacy school, Atalla worked as a pharmacy intern at CVS. In March 2018, while still in pharmacy school, Atalla began working as a pharmacy  intern, on a part-time basis, at Rite Aid; she would

---

**4**      The court noted that the seventh and eight causes of action in the complaint, for intentional infliction of emotional distress and negligent infliction of emotional distress, were previously dismissed by Atalla.

4.

work "maybe eight hours or a couple hours a month."[5] In this position, the store pharmacist would direct and evaluate her. In August 2018, Atalla began working as a "graduate intern" at Rite Aid. On December 23, 2018, Atalla moved up to the position of hourly staff pharmacist at Rite Aid.[6] Atalla stated in her declaration that Lund, as district manager, was the supervisor of graduate interns and staff pharmacists.

Starting from the time Atalla did her six-week rotation with Lund, she and Lund developed a social relationship. Over time, they became close friends. They were friends before Atalla started working at Rite Aid. Atalla also viewed Lund as a mentor.

Atalla and her husband celebrated a Friendsgiving at the home of Lund and his wife in 2017. Atalla and Lund texted frequently; they joked with one another in texts; they texted about personal matters; they texted about a wide range of things; and they sent multimedia messages to one another as well. They would go out to lunch together. At her deposition, Atalla was asked: "Before you ever worked at Rite Aid with Mr. Lund, you had a relationship that was wholly unconnected to your work at Rite Aid, correct?" Atalla answered: "Yes." For Lund's part, he similarly stated in his deposition that he and Atalla had been friends outside of work well before she joined Rite Aid; he felt Atalla was one of his best friends.

Atalla's friendship with Lund continued after Atalla began working at Rite Aid in March 2018. They continued to text frequently about all kinds of things, including travel and vacations, exercise, weight loss, food, restaurants, getting together for meals, religious observances, family and relatives, their respective spouses, pets, social media,

---

[5] In her declaration, Atalla indicated that pharmacist interns at Rite Aid were limited to working a maximum of eight hours per week.

[6] The complaint specifies that Atalla "began employment as an intern and then graduate intern with [Rite Aid]," and eventually, in December 2018, became a pharmacist with Rite Aid. Atalla stated in her declaration that she became a graduate intern in August 2018. However, Rodney Lachin, a divisional human resources leader for Rite Aid, stated in his declaration that Rite Aid's records indicated Atalla was hired as graduate intern in March 2018.

drinking and alcohol, birthdays, fashion, and work issues. They exchanged hundreds of texts. They would go out for coffee and meet up for lunch. In December 2018, Lund and his wife joined Atalla and her husband (and another couple) for dinner to celebrate Atalla's birthday.

**B.      Atalla and Lund Had an Extensive Texting Relationship**

Rite Aid adduced, in an exhibit attached to its motion for summary judgment, over 500 pages filled with text messages (along with images and photographs) exchanged between Atalla and Lund. Rite's Aid brief describes, in detail and over at least 10 pages, the contents of these text messages. Rather than reproducing that level of detail, we will highlight some of the text exchanges between Atalla and Lund to give a flavor of their texting relationship.

*(i)      Texts About Food, Restaurants, and Meeting Up for Lunch or Coffee*

Atalla and Lund texted frequently about food, restaurants, or getting together for coffee or lunch. In October 2017, Atalla and Lund texted about getting dinner together, along with their spouses. Lund suggested a Thursday at 6:30 p.m. Atalla texted, "Yes! Annex?" Lund responded, "Yes I already booked." Atalla said, "OK cool! Can't wait." Lund replied, "Me too." Atalla later texted she and her husband had a great time. They also texted in several other contexts about the Annex restaurant.

On February 1, 2018, Atalla texted Lund during the noon hour, "Hey can we have lunch at 4?" Lund said that "might be a little late" and asked whether they could "do earlier tomorrow?" The next day, shortly after 11:00 a.m., Atalla texted Lund, "Are you still free for lunch?" Lund responded in the affirmative and they decided to meet up at House of Juju. After lunch, Lund texted, "Enjoyed lunch two tickets to the gala are yours if you want it." Atalla replied: "I was just going to text you … saying the same! It was fun, we should do it more often! I'll take them if you don't want them."

On February 8, 2018, Atalla sent Lund a picture of a Yelp review for La Elegante Taqueria, writing, "I think I hit the jack pot." In the ensuing exchange about food and

restaurants, she told him she went to Colton's (a restaurant), where she "messed up" her diet by having a pastrami sandwich, wings, and garlic fries.

On March 2, 2018, Atalla texted Lund to say, "let's have lunch sometime!" On March 7, 2018, Lund and Atalla exchanged numerous texts about meeting up for lunch at "Gastro [G]rill." In another thread, from September 8, 2017, Atalla asked Lund for "the name of the noodle place we went to," and he replied with the name ("Q [N]oodle Fresno/Ashlan").

In October 2018, Lund sent Atalla a screen shot showing that Atalla had started following him on Instagram. In the ensuing exchange, Atalla texted, "We should do coffee sometime and catch up."

On November 7, 2018, Lund sent a text to Atalla suggesting they meet for coffee or lunch that week to catch up. Atalla sent Lund a text the next day asking whether he was still free for coffee. They discussed plans to meet at Kuppa Joy (local coffee shop), but Lund suggested they reschedule for another day when they had more time. Atalla replied with disappointment, "Aww man."

### (ii)  Texts About Vacation and Travel

Another subject of the texts exchanged by Lund and Atalla was vacation and travel. For example, Lund sent Atalla a picture from a beach, they exchanged texts about Lund's vacation in Hawaii, Atalla's trip to Florida, trips to Southern California, various trips to Disneyland, Lund's visit to Pennsylvania, Atalla's trips to Mexico and Thailand, Lund's planned cruises and Hawaii trip, Atalla's birthday trip to Las Vegas, and Lund's planned trip to Monterey.

### (iii)  Texts About Exercise and Weight Loss

Lund and Atalla texted on the subjects of exercise, dieting, and weight loss, as well. For example, they texted about Lund running 5K and 10K races, a spinning studio, Atalla hurting herself doing yoga, Lund's dislike of running on pavement, Atalla's efforts

7.

to lose weight, a tumbling class for Lund's wife, and Lund losing over thirty pounds. Lund shared with Atalla that his pants no longer "fit right" due to his weight loss.

During an exchange in which Lund told Atalla that his cholesterol was down 130 points, Atalla sent Lund a text saying, "That's awesome," and added, "You look great btw." In another exchange, Atalla told Lund, "You and Vanessa [Lund's wife] are looking so good!" In another text Lund shared he was excited to be wearing size large again.

In an exchange discussing Lund's diet and exercise, Atalla asked whether he was taking a statin. Lund explained he was going to go see a cholesterol specialist, while Atalla said she needed to get on his level and lose weight. Lund described his routine of going to the gym at lunchtime and Atalla replied, "Wow! That's really good." Atalla added, "My diet officially starts tomorrow."

### (iv) *Texts About Family, Personal Matters, and Work*

Lund and Atalla would text one another about personal matters, including, for example, family, spouses, kids, relatives, pets, social media, religion, and birthdays.

In one text, Atalla sent Lund a suit recommendation. In another, Atalla sent Lund someone's Facebook profile picture saying, "She does NOT look like that," to which Lund replied, "She a hottie," and Atalla responded, "She's really not."

In June 2018, Atalla asked how Lund was and he replied with a picture of his daughter holding her new kitten, together with a text stating, "Good[,] got a new family member." A series of texts about pets followed. On another occasion, they joked about "Snuggies."

They talked about the menu for a Friendsgiving to be held at Lund's house, which Atalla and her husband would be attending; they also texted about a good place to buy a turkey. They joked about the dishes Atalla could bring to complete the meal. They exchanged texts about Atalla's efforts to track down cherry pie, which she was craving. The day of the Friendsgiving, November 18, 2017, Atalla sent Lund a text stating, "Can't

wait!" Lund replied, "Me too got a feast." Atalla responded with texts stating "Woot woot!" and "On my way!" In December 2018, many texts were exchanged about getting together to celebrate Atalla's birthday.

Texts about various work-related topics were interspersed with innumerable texts about myriad personal topics, lighthearted jokes, and random check-ins. All the text communication occurred on Lund's and Atalla's respective personal cell phones.

## C. Lund Sent Inappropriate and Offensive Texts to Atalla

One month after Atalla and Lund dined together in celebration of her birthday, they engaged in their final text exchange, also on their personal cell phones. Lund was at a hotel in Modesto; earlier he had met his "wine group" at a restaurant there. Atalla was at home sitting on the couch with her husband. It was January 4, 2019, a Friday night.

In a text at 11:07 pm, Lund asked, "How did my newest pharmacist survive."[7] Atalla responded with texts stating, "I honestly don't know" and "I think it was ok, tough [because] I was fighting my cold but I'm picking it up." Lund replied, "You are my girl [so] conquer"; Atalla texted back, "I'm trying my best."[8] Atalla added: "[The senior pharmacist] says once I'm comfortable with everything she would love for me to cover for her ... that she trusts me." Lund responded, "That is high praise." Atalla replied, "But I never know if people are being nice or if they're serious."

Lund then sent Atalla a photo of five bottles of wine, and texted, in succession, "Here is Erik covering" and "4 of us tonight." Atalla replied, in a series of texts, "I'll take the first bottle," "Thanks," and "I'm doing the same with vodka, clearing my cold the Russian way." Lund texted, "Great choice," and sent a photo of a bottle of wine and another text stating, "The eagle way." Atalla replied, "What kind of wine is that." Lund

---

**7** Atalla had recently become an hourly staff pharmacist at Rite Aid.

**8** At Atalla's deposition she was asked: "[The "you are my girl" text message from Lund] really didn't offend you because you had exchanged similar text messages in the past where you were equally friendly with one another, correct?" Atalla answered: "Correct."

texted back, "Screaming eagle 03" and "3000+ a bottle." Atalla texted, "Whoaaa" and "Celebrating NYE?" Lund replied, "A few nights ago" and asked, "You?" Atalla responded, "LOL now I am."

Lund then texted Atalla a "Live Photo"[9] of him masturbating. Atalla—who was in her living room, sitting next to her husband on the couch, when she received the text—could tell at first glance it was an image of his penis. Atalla put her phone face down on her coffee table for 10 minutes, then went into the bathroom and viewed the Live Photo in private so her husband would not see it. While she was in the bathroom, Atalla received another text message from Lund that said, " 'I am so drunk right now.' " Atalla deleted that text and the Live Photo.[10]

Lund then sent another text stating, "Meant to send to wifey," followed by a text that said, "Going to go die." Atalla responded, "It's ok, I deleted it before I end up in a divorce." Atalla called her friend and went into her bedroom. While on the phone with her friend, Atalla received texts from Lund stating, "Both of us" and "Race to the bottom," accompanied by a photo of his penis.[11] Atalla texted Lund, "Erik, stop please," to which he replied, "You are right." That was the end of the exchange.

The next morning, Lund texted Atalla, "Wanted to apologize I was embarrassing drunk last night." Atalla did not respond.

**D.    Rite Aid Quickly Fired Lund; Atalla Did Not Return to Work**

On Sunday, January 6, 2019, Atalla called her training pharmacist and said she was not feeling well and would not be able to work that week. On Monday, January 7,

---

**9**    A "Live Photo" is a feature available on Apple devices that records 1.5 seconds before and after a picture is taken.

**10**    Neither Lund, nor Atalla preserved the Live Photo, but both testified to its existence.

**11**    A redacted version of this photo was submitted to the trial court with Rite Aid's motion papers and is included in the record on appeal.

2019, Lund texted Atalla asking whether she was still sick, but Atalla did not respond and blocked his number.

On January 10, 2019, Atalla's counsel, John Waterman sent a letter to Rite Aid asserting a claim of sexual harassment. Waterman's letter was forwarded to in-house counsel for Rite Aid, Emily Edmunds.

Edmunds spoke with Atalla's counsel on January 11, 2019. Atalla's counsel told Edmunds that Lund sent Atalla a video of himself masturbating and a still picture of his penis. Atalla's counsel also advised that Atalla "will not be returning to work at Rite Aid." Atalla's counsel said he had already obtained a right-to-sue letter and would be filing a complaint that coming Monday, January 15, 2019. He observed the question was damages and proposed early mediation.

Edmunds immediately directed Divisional Human Resources Leader Rodney Lachin (Lachin) to investigate Atalla's complaint. Lachin met with Lund the same day, January 11, 2019. Lund admitted sending Atalla the photo and video of his penis. Lachin handed Lund a copy of Rite Aid's anti-retaliation policy and placed him on suspension. Rite Aid investigated whether there were any other complaints of sexual harassment against Lund; the investigation revealed none.

Rite Aid made the decision to terminate Lund on Monday, January 14, 2019.[12] That same day, Edmunds emailed a letter to Atalla's counsel advising of Lund's termination and assuring them, "Ms. Atalla remains an active employee in our system, and she is welcome to return to work." Edmunds's letter invited Atalla to call the pharmacy scheduler so she could get back on the schedule (Edmunds provided the number). Edmunds also attached information about Rite Aid's Employee Assistance Program, through which Atalla could receive mental health counseling, financial advice, and other assistance.

---

**12** A termination notice was delivered to Lund on January 15, 2019.

As mentioned, Atalla's counsel had already told Edmunds that Atalla would "not be returning to work at Rite Aid," and neither counsel, nor Atalla, responded to Edmunds's letter; nor did they indicate in any way that Atalla intended to return to work at Rite Aid at some point. Atalla did not contact the scheduler as Edmunds had suggested; nor did she communicate to anyone at Rite Aid that she was uncomfortable doing so or that she needed a leave of absence.

On January 16, 2019, Edmunds spoke to Atalla's other counsel, Ken Fitzgerald. During the call, Fitzgerald reiterated that Atalla would not be returning to work at Rite Aid.

Edmunds waited the rest of the week but heard nothing further. Based on the statements of Atalla's counsel and the lack of any communication to the contrary, Edmunds concluded that Atalla had no intention of returning to work at Rite Aid and, rather, had decided to resign and pursue litigation. Accordingly, on January 21, 2019, Atalla's status in Rite Aid's system was changed to "resignation with the possibility of re-hire." On January 22, 2019, Rite Aid sent Atalla a separation notice, along with her vacation payout.

After Atalla received the separation notice, she did not communicate with anyone at Ride Aid for any needed clarification. She never contacted Rite Aid to indicate she wanted to return to work. Edmunds stated in her declaration: "Ms. Atalla would have been welcomed back at any time, but neither she nor her attorneys ever contacted Rite Aid to say she had any intention of returning to work at Rite Aid."

## DISCUSSION

### I.    Summary Judgment: Standard of Review

Any party may move for summary judgment in an action if it is contended that the action has no merit. (Code Civ. Proc., § 437c, subd. (a).)

"Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc.,

§ 437c, subd. (c).) This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. [Citation.] [¶] In reviewing a motion for summary judgment, we accept as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party. In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn therefrom are accepted as true." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 (*Hersant*).) " 'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249-1250.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. (See Evid. Code, § 500.) There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.… [A] plaintiff [moving for summary judgment] bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto. (Code Civ. Proc., § 437c, subd. (o)(1).) A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. (*Id*., § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850, fns. omitted.)

"[S]ummary judgment law in this state [no] longer require[s] a defendant moving for summary judgment to conclusively negate an element of the plaintiff's cause of action…. All that the defendant need do is to 'show[] that one or more elements of the

13.

cause of action … cannot be established' by the plaintiff.  (Code Civ. Proc., § 437c, subd. (o)(2).)"  (*Aguilar v. Atlantic Richfield Co*., *supra*, at p. 853, fn. omitted.)

## II.     Atalla's Sexual Harassment Claims

### A.     *Sexual Harassment:  Applicable Legal Framework*

Atalla's first and fourth causes of action allege sexual harassment under FEHA. FEHA prohibits sexual harassment in the workplace.  (See Gov. Code, § 12940, subd. (j)(1); *State Department of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034 (*Health Services*).)  More specifically, FEHA makes it an "unlawful employment practice" for an employer to harass an employee because of the employee's "*sex*, gender, gender identity, gender expression, … [or] sexual orientation."  (§ 12940, subd. (j)(1), italics added.)

" '[T]he prohibition against sexual harassment includes protection from a broad range of conduct, [including] the creation of a work environment that is hostile or abusive on the basis of sex.' "  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).)  "[A] plaintiff in a sexual harassment suit must show 'the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] … because of … sex." ' "  (*Lyle*, *supra*, 38 Cal.4th at p. 280, italics omitted.)  " 'To plead a cause of action for … sexual harassment, it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man [or a woman he or] she would not have been treated in the same manner.' " [Citation.]' [Citations.]  Accordingly, it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim."  (*Ibid*.)

"[P]rohibited harassment includes 'verbal, physical, and visual harassment, as well as unwanted sexual advances.'  [Citation.]  In this regard, *verbal* harassment may include epithets, derogatory comments, or slurs on the basis of sex; … *visual* harassment may include derogatory posters, cartoons, or drawings on the basis of sex."  (*Lyle*, *supra*, 38

14.

Cal.4th at pp. 280-281.)  The plaintiff "must establish the offending conduct was imputable to [his or] her employer."  (*Id*. at p. 279.)

The underlying goal of FEHA in this context is to provide effective measures to prevent *workplace* harassment.  (*Health Services*, *supra*, 31 Cal.4th at pp. 1046-1047.) " 'Under the FEHA … there is a need to determine whether sexual conduct that *occurs off the worksite or after working hours* constitutes an "unlawful employment practice" within the ambit of the act.' "  (*Myers v. Trendwest Resorts, Inc*. (2007) 148 Cal.App.4th 1403, 1422, quoting § 12940 (italics added).)

Under FEHA, an employer is strictly liable for harassment by a supervisor. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1236-1237, citing *Health Services*, *supra*, 31 Cal.4th at pp. 1040-1041.)  However, an employer is only strictly liable under FEHA for harassment by a supervisor "if the supervisor is acting in the capacity of supervisor when the harassment occurs."  (*Health Services, supra,* at p. 1041, fn. 3.)  "The employer is *not* strictly liable for a supervisor's acts of harassment resulting from a completely private relationship unconnected with the employment and not occurring at the workplace or during normal working hours."  (*Ibid*., italics added.)

Here, there is no dispute that Lund was a supervisor.  With respect to summary judgment on Atalla's sexual harassment claims, the issue below was and the issue on appeal is, *whether Lund was acting in the capacity of a supervisor in the text exchange in which he sent the inappropriate texts*, such that Rite Aid could properly be held strictly liable for that conduct.

### B.	Background:  Trial Court's Ruling on the Sexual Harassment Claims

The trial court concluded Atalla had not raised a triable issue of fact as to the required showing that Lund was acting in the capacity of a supervisor when he sent the inappropriate texts.  The trial court granted Rite Aid's motion for summary judgment as to Atalla's sexual harassment claims against Rite Aid (the employer).  The trial court ruled:

"FEHA protects against harassment in the workplace based on sex. (Cal. Gov. Code § 12940(j).) However, under FEHA 'there is a need to determine whether sexual conduct that occurs off the worksite or after working hours constitutes an "unlawful employment practice" within the ambit of the act.' (*Myers v. Trendwest Resorts, Inc*. (2007) 148 Cal.App.4th 1403, 1422.) 'FEHA makes the employer strictly liable for harassment by a supervisor.' (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1041.) The [*Health Services*] court added, however, that an employer is only strictly liable under FEHA for harassment by a supervisor if the supervisor is acting in the capacity of supervisor when the harassment occurs. (*Id*. at fn. 3.) The employer is not strictly liable for a supervisor's acts of harassment that results from a completely private relationship unconnected with the employment and not occurring at the workplace or during normal working hours. (*Ibid*.)

"The acts of harassment clearly did not occur at work or during normal working hours. That cannot be disputed. The question is whether the harassment arose from a completely private relationship unconnected with the employment. I think defendants have met their burden of showing that this is the case.

"Plaintiff admitted in her deposition that before she worked at Rite Aid, she had a relationship with Lund that was wholly unconnected to her work at Rite Aid. [Citation.] They socialized together and became close friends outside of work. [Citation.] They had dinner together with their spouses [citation], had lunch together without spouses [citation], got coffee together [citation], and celebrated birthdays and holidays together [citation].

"Plaintiff and Lund had an extensive personal texting relationship. As plaintiff points out they did text a lot about work, but they texted frequently and extensively about personal matters unconnected to work. [Citation.] This is consistent with how work friends communicate.

"Plaintiff contends in her opposition that she engaged with Lund in this way merely to foster a business relationship with a 'mentor' who could help her career. She claims in her declaration that her subjective motivation—her desire to further her career—was the reason she maintained a personal relationship with Lund and texted him all the time about personal matters, and 'but for' those subjective professional aspirations, the harassment would not have occurred. (See Atalla Dec.)

" 'Whether an employee is acting within the scope of his employment is generally a question of fact; however, if the undisputed

16.

evidence would not support an inference that the employee was acting within the scope of his employment, it becomes a question of law.[**13**]' (*Capital City Foods, Inc. v. Superior Court* (1992) 5 Cal.App.4th 1042, 1048.)

"Plaintiff contends that the offensive text messages were connected to work. After the initial inquiry about [how] plaintiff's week at work went (a common inquiry for a friend), Lund said, 'You're my girl, so conquer.' [Citation.] Plaintiff testified that she did not find this highly personal text offensive because she and Lund were equally friendly with one another in the past. [Citation.] The texting then moved onto the topic of alcohol, a common topic for plaintiff and Lund. [Citation.] Lund sent pictures of wine, bragging about how much he was drinking and how expensive the wine was. Plaintiff engaged in the talk, saying 'I'll take the first bottle' and telling Lund that she was 'doing the same with vodka.' [Citation.] After several more messages about the wine Lund was drinking [citation], plaintiff furthered the discussion by asking if Lund was celebrating New Year's Eve. [Citation.] That prompted four more texts between them [citation], and the inappropriate texts followed.

"It cannot reasonably be disputed that those texts were spawned from a personal exchange that arose from a friendship between plaintiff and Lund. Plaintiff's assertions in her declaration about how the relationship was entirely professional, for her purposes, is self-serving and inconsistent with the large volume of evidence of an outside-the-workplace friendship. There was nothing work related about the messages exchanged that evening. And this texting clearly indisputably occurred outside the workplace and outside of work hours. [Citation.]

"Plaintiff has not raised a triable issue of fact, and the motion should be granted."

---

**13** See *Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1048-1049 ["we distill the principle that while an employer's liability under [FEHA] for an act of sexual harassment committed by a supervisor or agent is *broader* than the liability created by the common law principle of respondeat superior, respondeat superior principles are nonetheless relevant in determining liability when, as here, the sexual harassment occurred away from the workplace and not during work hours"]. *Health Services*, *supra*, 31 Cal.4th at page 1041 and footnote 3, similarly explains that once a supervisor is found to have committed harassment, strict liability applies and principles of respondeat superior do not apply. However, principles of respondeat superior are relevant in determining liability in the first instance.

17.

## C.    Analysis

We affirm the trial court's conclusion that Atalla has not raised a triable issue of material fact with respect to the required showing that Lund was acting in the capacity of a supervisor in the text exchange in which he sent the inappropriate texts.  Rather, as the trial court found, Lund and Atalla had "an extensive texting relationship" and their January 4, 2019 late-night text exchange, which "occurred outside the workplace and outside of work hours," was "spawned from a personal exchange that arose from a friendship between [them]."  Summary judgment is therefore proper as to Atalla's sexual harassment claims.

Atalla and Lund both stated in their depositions that they were close friends and that their friendship predated Atalla's taking a pharmacy intern position at Rite Aid and continued thereafter.  Atalla candidly admitted in her declaration that her friendship with Lund developed before she ever worked at Rite Aid and that this preexisting relationship was wholly unconnected to her work at Rite Aid.  As for Lund, he testified he thought Atalla was "one of [his] best friends."

Both before and after Atalla worked at Rite Aid, she and Lund texted about a range of topics, extensively and frequently, including topics concerning family, vacations, food and dining, alcohol and drinking, people and pets, exercise, as well as chit chat about work.  They regularly met for coffee and lunch, got together for holiday and birthday dinners, and were acquainted with each other's spouses.

Atalla states, in a declaration attached to her opposition to Rite Aid's motion for summary judgment, that "Lund was simply a career mentor and supervisor" and that she only interacted with him to further herself in her career.  Not only do these statements in her declaration contradict her deposition testimony, but they are undercut by the hundreds of texts she exchanged with Lund over the time she knew him.  Rather than the occasional networking contact, their interactions were frequent, familiar, candid, and wide-ranging.

18.

Indeed, had their relationship been strictly professional as Atalla states in her declaration, they would not have been texting after 11:00 p.m. on a Friday night (as they did on January 4, 2019), in the first place. Their banter over texts that night—prior to Lund's texting of the inappropriate photos later in the exchange—was no different in tone and subject matter than loads of their other text exchanges as personal friends. Although Lund began the exchange by asking how Atalla's week at work went, that is, as the trial concluded, "a common inquiry for a friend."[14] Even with Lund's inquiry into how Atalla's week at work went, their text exchange was highly personal, as reflected in Lund's feedback, "You're my girl, [so] conquer." Atalla testified she was not offended by the personal phrasing because they had previously exchanged similarly friendly text messages with one another. After the introductory inquiry, their text exchange devolved into bantering about alcohol, a subject that frequently came up in their texts. Atalla acknowledged at deposition that they frequently texted about drinking and alcohol. Indeed, on a prior occasion, Lund had texted Atalla, "I drunk help."

Significantly, when the January 4, 2019 text exchange occurred, both participants were away from the workplace, and it occurred well outside working hours. Lund was in a hotel in Modesto, where he had traveled to meet with his wine group; he had met with the wine group at a restaurant and was back at his hotel. Atalla was at home, sitting on the couch with her husband, sipping vodka and nursing a cold. Atalla testified at deposition that their banter about alcohol that night was unconnected with her employment at Rite Aid and Lund was not supervising her in those texts. They bantered over texts as they usually did, until Lund texted the inappropriate photos. Up until Lund sent the lewd photos, there was nothing remarkable about their text exchange, given their texting history. The timing of the exchange, the fact that the participants were engaged in

---

**14** The record supports this point, as there were multiple other texts between Atalla and Lund where one or the other asked how the other was doing or how things were going.

personal pursuits at the time, and the nature of the exchange, tied the exchange to the personal friendship between Atalla and Lund.

We conclude Rite Aid has met its burden to show there is no triable issue of material fact on the question whether Lund's texting of the inappropriate photos was work-related. The evidence does not support an inference, *under the applicable standard of proof*, that the text exchange culminating in the inappropriate photos was work-related in that Lund was acting in his capacity as a supervisor, and the conduct was in turn properly imputable to Rite Aid. (See *Health Services*, *supra*, 31 Cal.4th at p. 1041, fn. 3 [an employer is strictly liable for the harassing conduct of a supervisor if "the supervisor is acting in the capacity of supervisor when the harassment occurs"].) Rite Aid is entitled to summary judgment on Atalla's sexual harassment claims.

### D. Relevant Caselaw

#### (i) *Capitol City Foods, Inc. v. Superior Court*

The cases cited by the parties support our conclusion. The case that is most instructive here is *Capitol City Foods, Inc. v. Superior Court* (1992) 5 Cal.App.4th 1042 (*Capitol City Foods*). The facts of *Capitol City Foods* are succinctly summarized therein:

> "Mary T. began working at defendant's Burger King franchise in January of 1989. Vernon Johnson was the night shift supervisor. On January 29, Mary and a coworker asked Johnson to go with them for a drink. Johnson could not go then, but suggested another time. Mary and Johnson made arrangements to go out on the 31st. They both believed the coworker would accompany them. Neither Johnson nor Mary was scheduled to work that day, but unbeknownst to Johnson, Dan Singh had changed the schedule and scheduled Mary to work that day at 5 p.m. At that time Mary was still in training and had a flexible schedule as she learned the job alongside more experienced workers. On January 31, as arranged, Johnson picked up Mary, who was in her Burger King uniform, at a grocery store at 4 p.m.; the co-worker did not show up. They drove around for 45 minutes, during which time Johnson made two phone calls. He called the Burger King and told Dan Singh that he should not have changed the schedule without Johnson's approval and that if Mary wanted to work she would come in late. He also called his parents' house. Johnson took Mary to his parents' house, where they had sexual

20.

intercourse.  Johnson then dropped Mary off at an auto repair store, and he went to the Burger King.  The next day Mary told the manager what had happened, and quit shortly thereafter.  [¶ ]  Mary [then] filed a complaint for sexual harassment, a form of sex discrimination [under FEHA,] [against Capitol City Foods, Inc. (the owner of the Burger King franchise), among other defendants]."  (*Capitol City Foods*, *supra*, 5 Cal.App.4th at p. 1044.)

Capitol City Foods, Inc., the defendant and Johnson's employer, argued "there [was an] insufficient nexus between Johnson's conduct and his employment; [and] since [the] plaintiff failed to raise a triable issue of fact on this point, summary judgment should be granted."  (*Capitol City Foods*, *supra*, 5 Cal.App.4th at p. 1047.)  Capitol City Foods, Inc. "point[ed] to the undisputed facts that Johnson was off-duty during the incident, the parties agreed to the date, and there was no evidence Johnson used his authority as a supervisor to compel Mary's presence.  She did not object to going with him and there was no evidence of coercion.  The single fact that he made a phone call regarding her work schedule was insufficient to bring his conduct within the scope of employment."  (*Id*. at p. 1048.)

On the other side, "[t]o show a sufficient nexus [the] plaintiff point[ed] to the following:  the 'date' was arranged in Johnson's office; when he picked her up she was in her Burger King uniform; and he exercised his authority to excuse her from work so she could be with him, facilitating the rape."  (*Capitol City Foods*, *supra*, 5 Cal.App.4th at p. 1050.)

The *Capitol City Foods* court focused on the point that it was undisputed that Johnson had not "forced [the] plaintiff to accompany him or coerced her in any way prior to entering his bedroom."  (*Capitol City Foods*, *supra*, 5 Cal.App.4th at p. 1050.)  The court concluded that, in light of that point, Johnson's "phone call to Burger King to excuse [her] from work [was] insufficient" to show that his conduct was work-related (i.e., that he had abused his authority as a supervisor to facilitate the rape).  (*Ibid*.)  The court concluded that Capitol City Foods, Inc., was therefore entitled to summary judgment on the plaintiff's sexual harassment claim.  (*Ibid*.)

Here, Atalla and Lund developed a personal relationship that predated Atalla's employment at Rite Aid and even after she joined Rite Aid, they continued to have a personal friendship. To the extent Atalla contends she was motivated by the prospect of professional advancement in maintaining a personal relationship with Lund, that does not change the fact of their personal relationship or the fact that Atalla was a *willing participant* in it. They texted extensively and regularly met up for various things, such as coffee and lunch. The text exchange at issue here took place when the participants were outside the workplace and after work hours. They engaged in the type of banter they regularly engaged in—including Lund's initial inquiry about how Atalla's week at work had gone—with no indication the exchange was anything but ordinary for them.

Lund texted about drinking wine and Atalla texted about drinking vodka; he texted her photos of wine bottles and she asked whether he was celebrating New Year's Eve. He also asked her the same question. Atalla participated in the exchange without protest and the exchange was typical of their texting history, which Lund did not undertake in the capacity of a supervisor. After a series of texts in this vein, Lund sent the inappropriate photos. Lund's initial inquiry about how Atalla's work week went was insufficient to render the text exchange work-related. As Rite Aid notes, had the supervisor in *Capitol City Foods* asked the plaintiff in that case how her shifts were going when he drove her to his parents' house, that question would not have rendered his subsequent assault on her work-related and imputable to his employer.

### (ii)    *Doe v. Capital Cities*

The parties also discuss *Doe v. Capital Cities*, *supra*, 50 Cal.App.4th 1038, which entailed review by the appellate court after the trial court had *sustained a demurrer* to the operative complaint, without granting leave to amend. The court in *Doe v. Capital Cities* described the issue before it as follows: "An aspiring actor is first drugged and then gang-raped by a casting director and four other men one Sunday at the casting director's

22.

home.  Can the actor successfully *allege* a cause of action for sexual harassment …

against the casting director's employers?"  (*Id*. at p. 1042, italics added.)

In *Doe v. Capital Cities*, the plaintiff, an aspiring actor, met a casting director for ABC, at a screening in July 1993.  Thereafter, the casting director worked with the plaintiff for a period of several weeks, promising to secure him a role in programs being developed by ABC.  The casting director told the actor he was the latter's " ' "Manager at ABC," ' " and worked closely with the actor in his office, for hours every day.  On Saturday, August 14, 1993, the plaintiff spent the day at the casting director's office preparing for his final auditions.  When they finished working, the casting director took the plaintiff to dinner with ABC executives.  After dinner, the casting director advised the plaintiff about a brunch the next morning and told him to be at the casting director's home at 8:00 a.m.  When the plaintiff went to the casting director's home at 8:00 a.m. on the morning of Sunday, August 15, 1993, he was expecting to attend a meeting of entertainment industry executives representing ABC shows.  Instead, he was drugged, beaten, and gang-raped by the casting director and four other men.  He later filed suit and brought a sexual harassment claim against ABC.

As mentioned, in *Doe v. Capital Cities*, the trial court had sustained a demurrer without leave to amend, prompting an appeal.  The appellate court observed:  "The crux of the matter is whether under the particular facts of this case, plaintiff can allege that ABC is liable for [the casting director's] actions."  (*Doe v. Capital Cities, supra*, 50 Cal.App.4th at p. 1046.)  As relevant here, *Doe v. Capital Cities* noted that a claim for sexual harassment requires "a showing of a legally sufficient nexus between the employment relationship and the act of harassment," that is, "as long as the harassment occurs in a work-related context, the employer is liable."  (*Id*. at p. 1051.)  *Doe v. Capital Cities* held "[the] [p]laintiff's presence at [the casting director's] home on August 15 was, *at least for pleading purposes*, a sufficient nexus to show that the assault and rape occurred in a work-related context."  (*Ibid*., italics added.)

The *Doe v. Capital Cities* court explained the reasoning for its conclusion. The court observed that unlike the situation in *Capitol City Foods* (discussed above), where "there was no evidence that the supervisor exercised his authority to compel the plaintiff to accompany him to the place in which the assault occurred," in the present case it was clear that the plaintiff actor's "*admission to employment require[d]* continuous participation in a *variety of activities at various locations* in pursuit of his acting career." (*Doe v. Capital Cities*, *supra*, 50 Cal.App.4th at p. 1052, italics added.) Further, a casting director "act[s] as a kind of gatekeeper to the glamorous world of entertainment [and] occupies a position which will predictably 'create the risk [a casting director] will commit intentional torts of the type for which liability is sought' in this matter," thereby reflecting a connection between the employment and the type of tort committed. (*Id*. at p. 1050.)

The procedural posture and facts of *Doe v. Capital Cities* are distinguishable from those in the instant case. Here, Atalla and Lund had a personal relationship that predated and was independent of their respective employment with Rite Aid. The offsite and afterhours text exchange the two engaged in on the night in question, up until Lund texted the inappropriate photos, was no different than innumerable other text exchanges between the two friends. There was no evidence that the nature of Lund's work and Atalla's work itself created a risk of the type of intentional tort Lund committed. Lund's inappropriate texts therefore cannot be said to be work-related.

### (iii) *Doe v. Starbucks, Inc.*

The parties also cite to *Doe v. Starbucks* (C.D. Cal., Dec. 18, 2009) 2009 U.S. Dist. LEXIS 118878 (*Doe v. Starbucks*). In that case, an adult supervisor had a sexual relationship with a minor under his supervision while they were both employed by the defendant, Starbucks. (*Id*. at pp. *1-2.) The minor was 16 when she was hired by Starbucks; the supervisor was 24. They often worked together. The supervisor repeatedly asked the minor " 'to go out with him.' " (*Id*. at p. *3.) She initially resisted,

but after the supervisor persisted in asking her out during work hours, she eventually agreed. An initial date developed into a sexual relationship. (*Id.* at pp. *3-4.) "They exchanged explicit, sexual comments and text message[s] at work." (*Id*. at p. *12.) "They 'smoked marijuana and had sex in his car' in the parking lot by Starbucks during work breaks." (*Ibid*.) "They also had sex in houses and hotels." (*Ibid*.) The supervisor told the minor "not to tell anyone about their sexual relationship." (*Ibid*.)

The minor finally told her mother. After her mother intervened, minor was transferred to another store. (*Id*. at pp. *13-*15) While the minor and her former supervisor continued to see each other, the frequency of their encounters decreased. (*Id*. at p. *15.) After the minor stopped working at Starbucks, she brought a lawsuit, which included a sexual harassment claim against the company. (*Id*. at pp. *15-16.)

The case survived a motion for summary judgment brought by Starbucks. (*Doe v. Starbucks*, *supra*, 2009 U.S. Dist. LEXIS 118878 at pp. *2, 32.) The question was whether the supervisor abused his authority in developing a sexual relationship with the minor or whether the minor willingly consented. The court observed: "Plaintiff was 16 and [the alleged harasser] was her 24 year old supervisor. While Defendants submit ample evidence that Plaintiff at times asked [the supervisor] for sex and had positive feelings toward him, Plaintiff submits evidence that she initially did not want to date [the supervisor] and only acquiesced after he persisted asking her out for months. Further, Plaintiff submits evidence that [the supervisor] was aware that she was under the influence of alcohol and marijuana during many of their sexual encounters. Considering this evidence, a reasonable jury could conclude that Plaintiff's acquiescence to sex with [the supervisor] resulted from [the supervisor's] manipulation and coercion." (*Id*. at p. *20-*21.)

The court found there was a triable issue of fact as to whether the minor's acts with the supervisor were voluntary or whether they resulted from his manipulation and coercion, and as to whether any manipulation and coercion stemmed directly from his

25.

role as the minor's supervisor. (*Doe v. Starbucks*, *supra*, 2009 U.S. Dist. LEXIS 118878 at pp. *30-31.) The court distinguished the facts of the case from the facts of *Capitol City Foods* (discussed above), in which "the plaintiff's voluntary acts destroyed the connection with the workplace." (*Id.* at p. *30.) Like *Capital City Foods*, the instant case lacks any indicia of coercion as to the lighthearted text exchanges Atalla and Lund engaged in since they first met, *before* Atalla began working at Rite Aid. *Doe v. Starbucks* is inapposite.

### (iv) *Myers v. Trendwest Resorts, Inc.*

Finally, the parties cite *Myers v. Trendwest Resorts*, *supra*, 148 Cal.App.4th 1403 (*Myers v. Trendwest*). "Trendwest is in the business of time-share sales and resort development. Sales are generated by customers taking a tour of a Trendwest sales office. Although contrary to Trendwest policy, salespersons at the Roseville office on occasion offered to follow home customers who had failed to bring their checkbook or credit card—a practice the Roseville office called, 'driving for dollars.' " (*Id.* at p. 1412.) Plaintiff was a salesperson at the Roseville office and brought a sexual harassment claim against Trendwest for the conduct of her supervisor. (*Id.* at pp. 1409, 1412.) Trendwest sought summary judgment as to the sexual harassment claim. (*Id.* at p. 1409.)

*Myers v. Trendwest* summarized the facts relevant to the summary judgment motion with respect to the sexual harassment claim:

> "Trendwest accepted as undisputed fact for summary judgment purposes that [plaintiff's supervisor] made sexual advances to plaintiff on two 'driving for dollars' trips…. On the first occasion, he tried to touch her hair and leg, pretended to be lost, parked on an isolated dirt road, tried to kiss plaintiff, said he would like to sleep with her, touched her breasts, and touched her vagina through her underwear. He told her she should go along with him because he was her project director, and he would guarantee that she achieved the President's Club [for high-performing salespersons]. On the second occasion, he drove her to his house, stating he wanted to show her some work-related documents and asked for five to 10 minutes of her personal time. Once inside his garage, he tried to kiss plaintiff, touched her breasts, put his hand up her dress, forced her hand down his pants between

26.

his pants and underwear, and tried to get her to come inside his house. Plaintiff threatened to pepper spray him. He took her back to the office. Neither of them reentered the office." (*Myers v. Trendwest*, *supra*, 148 Cal.App.4th at pp. 1412-1413.)

The trial court in *Myers v. Trendwest* "granted summary adjudication of [the sexual harassment] claim because the incidents took place outside the workplace, were not work related, and [the supervisor] was acting for his own personal interests rather than Trendwest's interests." (*Myers v. Trendwest*, *supra*, 148 Cal.App.4th at p. 1421.) The appellate court reversed the trial court's determination: "Here, the harassment did not result from a completely private relationship unconnected with the employment. There was no personal dating relationship between plaintiff and [her supervisor] at the time of the most significant incidents, which occurred during the 'driving for dollars' excursions. The 'driving for dollars' excursions were obviously connected with the employment and of obvious benefit to the employer's enterprise. Although there is some evidence that Trendwest did not approve of 'driving for dollars,' the evidence was conflicting on the point (precluding summary adjudication), and even if Trendwest did not approve of the practice, it admittedly was aware of the practice, clearly would benefit from the practice, and did nothing to stop it." (*Ibid.*)

Unlike the "driving for dollars" practice, which was of "obvious benefit to the employer's enterprise," the text exchange between Atalla and Lund on the night in question, with its personal tone and discussion of personal topics, was not undertaken for Rite Aid's benefit. (*Myers v. Trendwest*, *supra*, 148 Cal.App.4th at p.1421.) Moreover, Lund's personal texting relationship with Atalla preceded her employment with Rite Aid, and thus was not dependent on it. The instant case is more analogous to *Capitol City Foods* than to *Myers v. Trendwest*.

### E. Conclusion

We affirm the trial court's ruling granting Rite Aid's summary judgment motion as to Atalla's sexual harassment claims.

## III. Atalla's Constructive Termination Claim

### A. *Constructive Termination: Applicable Legal Framework*

"Employment relationships are generally terminated by resignation or discharge. [Citation.] An employee voluntarily severs the relationship by resignation; the employer does so by actual discharge." (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1244 (*Turner*).) "Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment." (*Ibid.*)

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner*, *supra*, 7 Cal.4th at pp. 1244-1245.) "Under the cases, an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id*. at p. 1246.) " 'There appears to be no disagreement [in the cases] that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions.' " (*Id*. at p. 1247.)

"The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position

' " 'would have felt compelled to resign.' " ' " (*Turner*, *supra*, 7 Cal.4th at pp. 1247, 1248 ["[T]he cases are in agreement that the standard by which a constructive discharge is determined is an objective one—the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' "].)  Finally, "[a] constructive discharge is the practical and legal equivalent of a dismissal—the employee's resignation must be *employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control." (*Id.* at pp. 1248, 1250 ["a wrongful discharge claim may prevail only if an employee can show the employer, or those representing the employer, either created or knowingly permitted working conditions to remain intolerable"].)

Our Supreme Court summed up the law of constructive discharge as follows:  "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.  [¶]  For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner*, *supra*, 7 Cal.4th at p. 1251.)  Our Supreme Court further held:  "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing.  Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*." (*Ibid.*)

29.

***B.  Background:  Trial Court's Ruling on Constructive Termination Claim***

Atalla's third cause of action alleges constructive discharge.  The trial court granted Rite Aid's summary judgment motion as to this cause of action.  The trial court ruled:

> " 'Constructive discharge occurs when the employer's conduct effectively forces an employee to resign.  Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will.  As a result, a constructive discharge is legally regarded as a firing rather than a resignation.'  (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1244-1245.)

> "To state a claim for constructive termination, plaintiff must show that the employer intentionally created or knowingly permitted intolerable working conditions that left the plaintiff with no choice but to resign.  (CACI 2432.)  To be intolerable, the adverse working conditions must be unusually aggravated or involve a continuous pattern of mistreatment.  (*Ibid*.)

> "Here, the evidence shows that Rite Aid did not know about or permit the intolerable working condition (Lund's lewd text messages) to occur.  And it immediately took action to rectify the situation upon learning of Lund's conduct.  [Citation.]

> "As opposed to a constructive termination, the evidence shows that plaintiff resigned her position.  On January 11, 2019, Emily Edmunds, Rite Aid's in-house counsel, spoke with plaintiff's counsel.  [Citation.]  Plaintiff's counsel told Edmunds that Lund sent plaintiff a video of himself masturbating and a still picture of his penis.  [Citation.]  Plaintiff's counsel told Edmunds that Atalla 'will not be returning to work at Rite Aid.'  [Citation.]  Plaintiff's counsel said he had already obtained a right-to-sue letter and would be filing a complaint in Fresno County Superior Court that coming Monday.  [Citation.]  Plaintiff's counsel said the question was damages, and he proposed early mediation.  [Citation.]  Plaintiff's counsel advised Edmunds that Plaintiff would not be returning to Rite Aid [citation], and Edmunds concluded that Atalla had resigned her employment in favor of legal action based on her attorneys' statements  and the lack of any other communication.  [Citation.]

> "The opposition points out that at no time before her termination, did Rite Aid apologize to plaintiff for what Lund had done to her.  Instead, they simply advised her that Lund was terminated and to contact the scheduler to

30.

begin work.  Rite Aid did not offer time off or give her options to help make her comfortable.  (See Atalla Dec. ¶ 28.)

"However, plaintiff presents no authority providing that an apology is required or relevant.  And she ignores the evidence that plaintiff never sought or requested a leave of absence.  [Citation.]

"While plaintiff did experience an intolerable occurrence that could reasonably have made working with Lund impossible, there was no constructive termination here.  Rite Aid immediately took action, terminated Lund, and invited plaintiff back to work.  Instead of requesting a leave of absence if she needed more time before returning to work, her attorney informed Rite Aid that she would not be returning to work at Rite Aid.  The undisputed facts show that plaintiff quit – she was not constructively terminated.  The motion should be granted as to the third cause of action."

## C.    Analysis

We agree with the trial court conclusion that, "[a]s opposed to a constructive termination, the evidence shows that plaintiff resigned her position."

Here, upon being notified of Lund's conduct, Rite Aid took immediate steps to remedy the situation.  Rite Aid immediately investigated the sexual harassment claim reported by Atalla's attorneys, terminated Lund expeditiously, advised Atalla's attorneys that Lund had been fired, invited Atalla back to work, and urged her to contact the scheduler to get back on schedule.  Atalla's attorneys, however, repeatedly advised Edmunds that Atalla would not be returning to work at Rite Aid.  Nor was any evidence adduced that Rite Aid intentionally created, or knowingly permitted intolerable working conditions that left Atalla with no choice but to resign.

Atalla contends she "thought she had been given a leave of absence," and upon receipt of the separation letter, "did not believe she had any options to return to work." However, Atalla's contentions are undermined by her own testimony in which she explicitly admitted she never took any action to secure a leave of absence.  Nor did Atalla contact anyone at Rite Aid, at any time, to inform them she wanted to return to work, not

31.

even upon receipt of the separation letter. On the contrary, as noted above, her attorneys informed Rite Aid that Atalla would not be returning to work.

We affirm the trial court's ruling that "there was no constructive termination here." Summary judgment is therefore proper as to Atalla's constructive termination claim.

## IV. Atalla's Discrimination and Retaliation Claims

### A. *Background: Trial Court's Rulings on the Discrimination and Retaliation Claims*

Atalla's fifth and sixth causes of action are for discrimination and retaliation, respectively. The trial court granted summary judgment in favor of Rite Aid, as to these causes of action. The trial court ruled:

> "The fifth and sixth causes of action are also based on the allegation of wrongful discharge.

> "The fifth cause of action is for discrimination under FEHA, alleging that 'Plaintiff was wrongfully discriminated against by her employer Defendant Rite Aid Corporation when she was constructively discharged. Plaintiff was discriminated against based on her sex and/or gender which was a substantial motivating reason for Defendant Rite Aid Corporation's decision to constructively discharge Plaintiff.' (FAC ¶ 62.)

> "The sixth cause of action is for retaliation under FEHA, based on the same contention that plaintiff was constructively terminated for complaining of sexual harassment. (FAC ¶ 68.)

> "However, as discussed above, there was no constructive termination. These causes of action fail[] for the same reason as the third cause of action."

### B. *Conclusion*

We affirm the trial court's ruling granting summary judgment as to Atalla's claims for discrimination and retaliation.

32.

## V.      Atalla's Claim for Punitive Damages

The trial court ruled that Atalla's claim for punitive damages was moot. Specifically, the trial court stated: "Defendants also move for summary adjudication of the claim for punitive damages. However, given that plaintiff has no remaining cause of action, the motion is moot as to the claim for punitive damages. The damages must attach to a cause of action." We affirm the trial court's ruling as to Atalla's claim for punitive damages.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

                                                                     SMITH, J.

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.

33.

Filed 3/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HANIN ATALLA,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>RITE AID CORPORATION et al.,<br><br>    Defendant and Respondent. | F082794<br><br>(Super. Ct. No. 19CECG00569)<br><br>**ORDER GRANTING REQUEST**<br>**FOR PUBLICATION** |

        As the nonpublished opinion filed on February 24, 2023, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), the requests for publication filed on March 13, 2023, are hereby granted and it is ordered that the opinion be certified for publication in the Official Reports.


                                                                                                            SMITH, J.


WE CONCUR:



PEÑA, Acting P.J.



DESANTOS, J.